Opinion for the Court filed by Chief Judge SENTELLE.
Concurring opinion filed by Circuit Judge TATEL.
Dissenting opinion filed by Circuit Judge KAVANAUGH.
SENTELLE, Chief Judge:
Petitioners, trade associations whose members are part of the petroleum and food industries, filed petitions for review of two EPA decisions approving the introduction of E15 — a blend of gasoline and 15 percent ethanol — for use in select motor vehicles and engines. Because we hold that no petitioner has standing to bring this action, we dismiss all petitions for lack of jurisdiction.
I. The Waiver Proceeding
In the Energy Policy Act of 2005, Congress incorporated into the Clean Air Act (CAA) the Renewable Fuel Standard, Pub. L. 109-58, § 1501(a) (2005) (RFS). As amended, the RFS requires qualifying refiners and importers of gasoline or diesel fuel to introduce into U.S. commerce a specified, annually increasing volume of renewable fuel. 42 U.S.C. § 7545(o )(2)(A)(i).
In order to comply with the requirements of the RFS, refiners and importers primarily blend corn-based ethanol into the fuel supply. The national gasoline supply currently consists largely of “E10,” a gasoline blended with 10 percent ethanol. Given the continual increase in required volume of renewable fuel, E10 alone will not meet the producers’ obligations forever. E10 has substantially saturated the U.S. gasoline market already, yet the volume of renewable fuel required to be introduced increases annually, up to 36 billion gallons of renewable fuel in 2022. Id. § 7545(o )(2)(B)(i)(I). Moreover, an increasing percentage of the increasing RFS obligation must come from “advanced bio-fuels,” ie., sources other than ethanol derived from corn. Id. § 7545(o )(2)(B)(i)(II) (requiring that advanced biofuel make up 21 billion of the 36 billion gallons of renewable fuel required in 2022). Fuel manufacturers must, therefore, introduce new types of renewable fuels in order to continue to meet their growing burden under the RFS.
Fuel manufacturers cannot introduce new renewable fuels into the market at will. The Clean Air Act prohibits manufacturers from introducing into commerce “any fuel or fuel additive for use by any person in motor vehicles manufactured after model year 1974 which is not substantially similar to any fuel or fuel additive” used in the federal emissions certification of those vehicles. 42 U.S.C. § 7545(f)(1)(B). To bring most new fuels (including renewable fuels) to market, a manufacturer must apply for a waiver of this prohibition pursuant to CAA Section 211(f)(4), 42 U.S.C. § 7545(f)(4). The Administrator of EPA may grant such a waiver “if he determines that the applicant has established that such fuel or fuel additive or a specified concentration thereof, and [its] emission products ..., will not cause or contribute to a failure of any emission control device or system (over the useful life of the motor vehicle, motor vehicle engine, nonroad engine or nonroad vehicle in which such device or system is *173 used) to achieve compliance by the vehicle or engine with the emission standards with respect to which [the vehicle or engine] has been certified pursuant to sections 7525 and 7547(a) of this title.” 42 U.S.C. § 7545(f)(4).
In March 2009, Growth Energy, a trade association representing the ethanol industry, applied for a Section 211(f)(4) waiver to introduce E15, an unleaded gasoline blend containing 15 percent ethanol. After notice and comment, EPA issued two separate waiver decisions. In its first waiver decision, Partial Grant and Partial Denial of Clean Air Act Waiver Application Submitted by Growth Energy To Increase the Allowable Ethanol Content of Gasoline to 15 Percent, 75 Fed. Reg. 68,-094 (Nov. 4, 2010), EPA approved the introduction of E15 for use in light-duty motor vehicles from model-year 2007 and later. At the same time, it denied the waiver for model-year 2000 and older vehicles because it could not determine given the data available that using E15 in such vehicles would not contribute to failures of emissions controls. For the same reason, EPA denied the waiver for nonroad engines, vehicles, and equipment (e.g., boats, all-terrain vehicles, and weedeaters), heavy-duty gasoline engines and vehicles, and motorcycles. Finally, EPA deferred its decision whether to approve E15 for use in model-year 2001-2006 light-duty motor vehicles and engines, stating that it needed further results from Department of Energy (DOE) tests that measured the effects of ethanol blends on the durability of engine catalysts (which “scrub” motor vehicle emissions by converting harmful exhaust gases into carbon dioxide, nitrogen, and water). After receiving those results, EPA issued a second decision. Partial Grant of Clean Air Act Waiver Application Submitted by Growth Energy To Increase the Allowable Ethanol Content of Gasoline to 15 Percent, 76 Fed. Reg. 4662 (Jan. 26, 2011). That second decision extended the waiver to permit the use of E15 in light-duty motor vehicles and engines from model-years 2001-2006.
In sum, EPA granted “partial” waivers approving the introduction of E15 for use in model-year 2001 and newer light-duty motor vehicles and engines. These waivers are conditional. E15 manufacturers are required to (1) introduce only E15 that meets certain fuel quality parameters and (2) submit for approval by EPA a plan for the implementation of “misfueling mitigation conditions” set forth in the EPA decision. The term “misfueling,” as used in the EPA decisions, refers to the use of E15 in pre-2001 vehicles and other non-approved vehicles, engines, and’ equipment. The misfueling mitigation conditions and strategies which EPA set forth as necessary for such a plan included pump-labeling requirements, participation in a pump-labeling and fuel-sample compliance survey, and proper documentation of ethanol content on transfer documents.
Three sets of industry groups (collectively, “Petitioners”) representing members who either (1) manufacture engines and related products (the “engine-products group” or “engine manufacturers”), (2) sell food (including livestock) that requires corn as an input (the “food group” or “food producers”), or (3) produce or handle petroleum and renewable fuels (the “petroleum group” or “petroleum suppliers”) petitioned this court for review of EPA’s E15 waivers. We review herein the consolidated petitions. Growth Energy, the waiver applicant, intervened in support of EPA’s defense of its waiver decisions.
II. Standing
Petitioners contend that (1) EPA lacks authority under CAA Section 211(f)(4) to grant “partial” waivers approving the use of E15; (2) Growth Energy, the waiver applicant, failed to meet a re *174 quired evidentiary burden under Section 211(f)(4); (3) EPA failed to provide sufficient opportunity for comment on certain aspects of its waiver decision; and (4) the record does not support EPA’s decision to grant the partial waivers. While the government does not contest petitioners’ standing to petition for review of EPA’s waiver decisions, intervenor Growth Energy has called our attention to the potential failure of petitioners to establish standing under Article III. Even in the absence of intervenor’s objection, we would be required to review petitioners’ standing. Standing under Article III is jurisdictional. If no petitioner has Article III standing, then this court has no jurisdiction to consider these petitions. See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Regardless of whether the parties raised the issue, we have “an independent obligation to be sure of our jurisdiction.” Sierra Club v. EPA, 292 F.3d 895, 898 (D.C.Cir.2002). Therefore, before we even consider the merits of the petitions, we must determine whether any petitioner has standing to bring them to court.
A.
As the Supreme Court has declared, “the law of Art. Ill standing is built on ... the idea of separation of powers.” Allen v. Wright, 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The application of the standing doctrine, along with other jurisdictional requirements, ensures that federal courts act only within their constitutionally prescribed role: resolving “Cases” and “Controversies,” U.S. Const. art. III, § 2, cl. 1, “those disputes which are appropriately resolved through the judicial process,” Lujan, 504 U.S. at 560, 112 S.Ct. 2130. See also Fla. Audubon Soc’y v. Bentsen, 94 F.3d 658, 663 (D.C.Cir.1996) (en banc). To establish Article III standing, a party must establish three constitutional minima: (1) that the party has suffered an “injury in fact,” (2) that the injury is “fairly traceable” to the challenged action of the defendant, and (3) that it is “likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.” Lujan, 504 U.S. at 560-61, 112 S.Ct. 2130 (internal quotation marks, alterations, and citations omitted).
The party seeking to invoke the jurisdiction of the federal court “bears the burden of establishing these elements.” Id. at 561, 112 S.Ct. 2130. To do so, it must “support each element of its claim to standing ‘by affidavit or other evidence.’ ” Sierra Club, 292 F.3d at 899 (quoting Lujan, 504 U.S. at 561, 112 S.Ct. 2130). On direct review of agency action, it must provide that support in its opening brief. Public Citizen, Inc. v. NHTSA 489 F.3d 1279, 1289 (D.C.Cir.2007). If the petitioner’s standing is self-evident (as when the petitioner is the object of an administrative action), “no evidence outside the administrative record is necessary.” Sierra Club, 292 F.3d at 900. But when the administrative record fails to establish a substantial probability as to any element of standing, “the petitioner must supplement the record to the extent necessary to explain and substantiate its entitlement to judicial review.” Id.
B.
As an initial matter, we note that each separate petitioner in this case is a trade association. Each petitions for review of EPA’s waiver decisions on behalf of its members, e.g., car manufacturers, petroleum refiners, and cereal distributors. This is not in itself a problem. An association has standing to sue on its members’ behalf if it can show that (1) a member “would have standing to sue in [its] own right,” (2) “the interests the association seeks to protect are germane to its pur *175 pose,” and (3) “neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit.” Id. at 898. We have no reason to believe any petitioners fail to meet the latter two requirements. We therefore need consider only whether any petitioner association has demonstrated that any of its members would have standing to sue in its own right.
We need not conclude that all petitioners have standing. As all petitioners raise the same issues, if we determine that even one of the petitioners has Article III standing, we will then have established our jurisdiction to consider the merits of the petitions. See, e.g., Military Toxics Project v. EPA, 146 F.3d 948, 954 (D.C.Cir.1998). Standing is not self-evident for any of the entities Petitioners represent. EPA’s waiver decisions do not on their face directly impose regulatory restrictions, costs, or other burdens on any of these types of entities. This, of course, makes Petitioners’ task more difficult. “The Supreme Court has stated that standing is ‘substantially more difficult to establish’ where, as here, the parties invoking federal jurisdiction are not ‘the object of the government action or inaction’ they challenge.” See Public Citizen, 489 F.3d at 1289 (quoting Lujan, 504 U.S. at 562, 112 S.Ct. 2130.). Petitioners have to demonstrate that EPA’s actions — in particular, approving E15 via partial waivers — have caused any one of their members an injury in fact for which we can provide redress in this action. Each industry group advances a theory of standing, but none is in fact adequate to meet the burden of establishing standing under Article III.
1. The Engine-Products Group
The engine-products group advances a convoluted theory of standing. It begins with the assertion that its members manufacture cars, boats, and power equipment with engines not made for, certified, or warranted to use ethanol blends greater than E10. As a result of EPA’s partial waivers, they assert, E15 will enter the fuel market and consumers will use it in their products. Such use, the engine manufacturers claim, “may” harm their engines and emission-control devices and systems. Pet’rs Br. at 17. This will supposedly subject the engine manufacturers to liability: consumers may bring warranty and safety-related claims against the manufacturers under state or federal law, and the government may impose a recall of some engines or vehicles.
This hypothetical chain of events fails as a showing of Article III standing. An Article III injury in fact must be “(i) ‘concrete and particularized’ rather than abstract or generalized, and (ii)‘actual or imminent’ rather than remote, speculative, conjectural or hypothetical.” In re Navy Chaplaincy, 534 F.3d 756, 759-60 (D.C.Cir.2008). It must also be “substantially probable” that the challenged agency action caused that injury. See Fla. Audubon, 94 F.3d at 663 (citing Kurtz v. Baker, 829 F.2d 1133, 1144 (D.C.Cir.1987)). The engine-products group’s theory of standing meets neither of these requirements.
To begin with, the engine manufacturers provide almost no support for their assertion that E15 “may” damage the engines they have sold, subjecting them to liability. They suggest that damage may occur via two avenues. First, they contend that consumers will use E15 in the model-year 2001 and newer light-duty vehicles and engines for which it has been approved, and that E15 may harm those engines (contrary to EPA’s findings). They support this assertion, however, with a single reference to internal testing by Mercedes-Benz documenting a 2 percent hit to fuel economy and “potential vehicle damage” *176 from the use of E15 in Mercedes vehicles. This is hardly evidence of a substantial probability that E15 will cause engine harm.
Second, the engine-products group maintains that consumers will “misfuel,” i.e., fuel non-approved vehicles and equipment with E15, and that E15 will cause damage to and emissions failures in such engines, including boat engines and power equipment motors, for which engine manufacturers may incur liability. This convoluted theory of causation will not meet Petitioners’ burden. It is well established that “[e]ausation, or ‘traceability,’ examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff.” Fla. Audubon Soc’y v. Bentsen, 94 F.3d at 663 (citing Allen v. Wright, 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)) (other citations omitted). As in Florida Audubon, Allen v. Wright, and numerous other cases cited in Florida Audubon, any injury to the engine-product petitioners—speculative at best—depends upon the acts of third parties not before the court. If the contemplated injury is to occur at all, it will require that consumers use the fuel in engines for which it is neither designed nor approved, suffer damages to those engines as a result, and bring successful warranty or other liability lawsuits against engine-products petitioners. These petitioners attempt to drag them claims across the causation threshold by simply listing federal laws that either impose liability for emission warranty claims, see 42 U.S.C. § 7541, or provide for recall of nonroad engines and vehicles that fail to meet emission standards, id. § 7547. This is not sufficient. That a theoretical possibility of lawsuits exists does not establish the required probability that the third parties will misfuel in the fashion posited by petitioners, then bring the lawsuits, then prevail. The last link is particularly problematic; the engine-products petitioners have failed to point to any grounds for a meritorious suit against them. As they admit, Pet’rs’ Br. at 18, their engines are not warranted for E15, nor is it clear why manufacturers would be liable for damages from consumer-induced misfueling. As for their recall theory, they have failed to establish any probability that the government would recall engines because third parties had misfueled. This leaves yet another weak link in their causative chain, especially given the limited circumstances in which manufacturers are generally subject to a recall, see Chrysler Corp. v. EPA, 631 F.2d 865, 896 (D.C.Cir.1980).
To reiterate what we noted earlier in this discussion, “[T]he ‘case or controversy’ limitation of Article III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.” Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). The engine-products group has not established standing to bring these petitions.
2. The Petroleum Group
The petroleum group includes associations that represent refiners and iim porters, which produce petroleum products, as well as “downstream” entities like fuel blenders and terminals, which handle, store, or transfer those products. The petroleum group asserts that both groups suffer an injury in fact traceable to EPA’s waiver decisions. It argues that EPA’s partial approval of the introduction of E15 into commerce effectively forces refiners and importers to actually introduce E15 into commerce because they are obligated to meet the renewable fuel requirements *177 of the RFS. They further assert that the downstream entities will have to accommodate this new fuel type. Both sets of entities will incur substantial costs as a result of taking on E15, including “special fuel production, transportation, and fuel segregation efforts.” Pet’rs’ Br. at 19. Further costs will come from the “new compliance surveys and fuel pump dispenser labeling” required by the E15 waiver decisions. Id. In addition, these entities will purportedly face the liability risks that come with producing a fuel that they contend will cause damage to misfueled vehicles.
This theory fails to establish standing. We cannot fairly trace the petroleum group’s asserted injuries in fact — the new costs and liabilities of introducing and dealing with E15 — to the administrative action under review in this case. That action, EPA’s approval of the introduction of E15 for use in certain vehicles and engines, does not force, require, or even encourage fuel manufacturers or any related entity to introduce the new fuel; it simply permits them to do so by waiving the CAA’s prohibition on introducing a new fuel that is not substantially similar to the fuel used to certify vehicles and engines under their applicable emission standards, see 42 U.S.C. § 7545(f)(4). In short, the only real effect of EPA’s partial waivers is to provide fuel manufacturers the option to introduce a new fuel, E15. To the extent the petroleum group’s members implement that option voluntarily, any injury they incur as a result is a “self-inflicted harm” not fairly traceable to the challenged government conduct. See, e.g., Pub. Citizen, 489 F.3d at 1290 (citing Nat’l Family Planning & Reproductive Health Ass’n, Inc. v. Gonzales, 468 F.3d 826, 831 (D.C.Cir.2006)); Petro-Chem Processing, Inc. v. EPA 866 F.2d 433, 438 (D.C.Cir.1989).
Petitioners maintain that the new fuel choice provided by the partial waivers is no real choice at all. They stress that if EPA makes E15 an option (as it did), “refiners and importers will necessarily have to introduce E15 into commerce” to meet their volume requirements under the RFS. Even if we were to consider the refiners’ and importers’ decision to introduce E15 as forced rather than voluntary, it would be “forced” (under their theory) not by the availability of E15 (which is the only effect of the partial waivers) but rather by the RFS, which obliges manufacturers to introduce certain volumes of renewable fuel. In other words, if the injuries of refiners and importers are traceable to anything other than their own choice to incur them, it is to the RFS, not to the partial waivers they challenge here.
In any event, Petitioners have not established that refiners and importers will indeed have to introduce E15 to meet their volume requirements under the RFS. The partial waivers provide obligated parties with a new option for meeting those requirements, but the RFS does not mandate that obligated parties use E15 or any other particular product to meet its requirements. In fact, as noted above, refiners and importers may only use a capped amount of corn-based ethanol to meet their RFS obligations, and they are already nearing that cap. They have provided no reason why they could not instead use a different type of fuel to meet those obligations. Of course, if that reason is cost— either the costs of research and development of fuels, or the costs of introduction of such a fuel — then their choice to instead use E15 would be a decision grounded in economics, not one forced on them by the RFS and most certainly not by the partial waivers. Moreover, Petitioners themselves indicated that there are still other options besides using E15: “The RFS includes mechanisms by which the EPA Ad *178 ministrator may waive the total volume of renewable fuel for any given year or waive requirements for certain renewable fuels.” Pet’rs’ Br. at 5 (citing 42 U.S.C. § 7545(o )(7)(A)(i)-(ii), (D), (E), (F)). While EPA may decline to waive the RFS requirements, lobbying the Administrator to do so is another option at Petitioners’ disposal. In sum, Petitioners have not demonstrated that the partial E15 waivers provide refiners and importers with a Hob-son’s choice (introduce E15 or violate the RFS) rather than a real one, such that the costs they would sustain by introducing E15 could be considered “forced by” or traceable to the challenged agency action.
Petitioners offer a related argument centered on the downstream parties. These parties own infrastructure (e.g., deepwater, barge, and pipeline terminals) that aids in the transfer, handling, and blending of petroleum products. Pet’rs’ Br. at x-xi, 19. Regardless of whether the E15 waiver can be said to “cause” petroleum refiners and importers to begin introducing E15, Petitioners suggest that they will introduce it given their RFS obligations, and downstream entities will have to expend significant resources to blend and otherwise deal with the E15 the refiners and importers choose to introduce. In this way, according to Petitioners, “EPA’s partial E15 waiver therefore will require these organizations to expend enormous resources to blend and introduce E15 into the market.” Pet’rs’ Br. at 19.
With this argument, Petitioners again wrongly identify the actual cause of downstream entities’ choice to incur the costs of handling E15. Neither the RFS nor the partial E15 waivers “require” downstream entities to have anything to do with E15. If they face any pressure to handle E15, it is likely economic in nature. Downstream parties very well might lose business if they decline to blend or otherwise deal with E15, but that makes the choice to handle E15 one they make in their own self-interest, not one forced by any particular administrative action. In this way, Petitioners’ argument is much like one we rejected in Petro-Chem Processing v. EPA, 866 F.2d at 438. In that case, the Hazardous Waste Treatment Council (HWTC) challenged EPA regulation of hazardous waste disposal in salt domes that HWTC argued was too lax. HWTC asserted that its members who provide cleanup services or waste brokering would be “forced” to use geologic repositories (salt domes) under the lax EPA standards and their use of unsafe methods would risk greater potential liability. The court rejected this theory of standing. We pointed out that this potential liability, “insofar as it is incurred voluntarily, is not an injury that fairly can be traced to the challenged action.” Id. (internal quotation marks omitted). The members who used salt domes could avoid the potential liability by choosing safer methods than required by EPA. If they chose the unsafe methods because of “competitive pressures,” they would presumably do so “in their own self-interest.” Id. The resulting injury would thus be “self-inflicted, ... so completely due to the [complainants’] own fault as to break the causal chain.” Id. (internal quotation marks omitted). So too here.
All of this is to say that Petitioners’ attempt to draw a causal link between the E15 waivers they challenge and the costs they would incur by introducing E15 ultimately rings hollow. If anything is “forcing” these entities to incur the costs of introducing a new fuel, it is the obligations set by the RFS, competitive pressures, or some combination thereof. EPA’s partial waivers simply provide a new choice of fuel that manufacturers may produce. There is not a cause of those costs providing the petroleum group with standing.
*179 3. The Food Group
The food group’s members produce, market, and distribute food products that require corn. This petitioner group suggests that EPA’s partial approval of E15 will increase the demand for corn, which is currently used to produce most ethanol on the market. This increased demand will, according to the food group, increase the prices their members have to pay for corn.
We need not decide here whether the food group has established Article III standing with this theory because the theory plainly fails to demonstrate prudential standing.[1] While we must find Article III standing before addressing the merits of a case, see supra pp. 173-74, “it is entirely proper to consider whether there is prudential standing while leaving the question of constitutional standing in doubt, as there is no mandated ‘sequencing of jurisdictional issues.’ ” Grand Council of Crees (of Quebec) v. FERC, 198 F.3d 950, 954 (D.C.Cir.2000) (quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 575, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999)).
To demonstrate prudential standing, the food group “must show that the interest it seeks to protect is arguably within the zone of interests to be protected or regulated by the statute ... in question” or by any provision “integrally] related]” to it. Nat’l Petrochem. Refiners Ass’n v. EPA 287 F.3d 1130, 1147 (D.C.Cir.2002) (per curiam) (internal quotation marks omitted). The food petitioners have not made such a showing. They point out only that their interests are protected by EISA, the legislation that set forth the RFS, because EISA requires EPA to review, among other things, “the impact of the use of renewable fuels on ... the price and supply of agricultural commodities ... and food prices” when EPA sets renewable fuel volume requirements in the future. 42 U.S.C. § 7545(o )(2)(B)(ii)(VI). However, the statute Petitioners challenge here is the CAA’s fuel-waiver provision, Section 211(f)(4) — not EISA. Nor is EISA “integrally] relatfed] to Section 211(f)(4). Both statutes may have fuel as their subject matter, and the RFS may have even incentivized Growth Energy to apply for a waiver under Section 211(f)(4). But more is required to establish an “integral relationship” between the statute a petitioner claims is protecting its interests and the statute actually in question; otherwise, “the zone-of-interests test could be ‘deprive[d] ... of virtually all meaning.’ ” Fed’n for Am. Immigration Reform, Inc. v. Reno, 93 F.3d 897, 903 (D.C.Cir.1996) (quoting Air Courier Conference of Am. v. Am. Postal Workers Union, 498 U.S. 517, 530, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991)). Hypothetical prudential standing to challenge action under EISA does not give the food petitioners prudential standing to petition for review of action taken pursuant to CAA Section 211(f)(4).
The dissent relies on Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, — U.S. -, 132 S.Ct. 2199, 183 L.Ed.2d 211 (2012), but that decision neither changed the prudential-standing standard nor has any particular applicability to the facts here. The food group’s interest in low corn prices is much further removed from a provision about cars and fuel than a neighboring land owner’s interest is from a statute about land acquisition.
*180 III. Conclusion
For the above reasons, we hold that no petitioner has standing to bring these claims. We therefore dismiss all petitions for lack of jurisdiction.

. Chief Judge Sentelle would hold that the food group has neither Article III nor prudential standing.