# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-2170

_____

Elmer Lucas; Margarito Rodas; Gonzalo Leal; Feliciano Macario; Bernabe
Villavicencio; Esvin Lucas

*Plaintiffs - Appellees*

v.

Jerusalem Cafe, LLC; Farid Azzeh, Individually; Adel Alazzeh, Individually and as
successor in interest to Jerusalem Cafe LLC, doing business as Jerusalem Cafe, LLC

*Defendants - Appellants*

_____

Secretary of Labor

*Amicus on Behalf of Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: February 14, 2013
Filed: July 29, 2013

_____

Before RILEY, Chief Judge, LOKEN and SHEPHERD, Circuit Judges.

_____

RILEY, Chief Judge.

For varying periods between June 2007 and March 2010, Elmer Lucas and five other aliens (collectively, workers), without employment authorization, toiled in the Jerusalem Cafe (Cafe), some for less than minimum wage and all without receiving overtime wages. The workers sued the Cafe, and its then-owner Farid Azzeh and manager Adel Alazzeh (collectively, employers), for willfully violating the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 201, et seq.. After a jury decided in the workers' favor, the district court[1] awarded the workers minimum and overtime wages, statutory liquidated damages, and legal fees. The district court denied the employers' motion for judgment as a matter of law, rejecting the argument that the workers, as aliens without work authorization, lacked standing to sue. The employers appeal, contending the FLSA does not apply to employers who illegally hire unauthorized aliens. We disagree. The FLSA does not allow employers to exploit any employee's immigration status or to profit from hiring unauthorized aliens in violation of federal law. Exercising our jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND
### A.    Facts[2]

This case concerns the employers' failure to pay minimum and overtime wages between June 2007 and March 2010. During this period, Azzeh, the owner of the

---

[1]The Honorable David Gregory Kays, United States District Judge for the Western District of Missouri.

[2]The appellants' statement of facts evinces a desire to retry some facts, but a jury has decided the disputed questions of fact. As usual in such cases, we recount "the facts in the light most favorable to the jury verdict." Newhouse v. McCormick & Co., 110 F.3d 635, 637 (8th Cir. 1997).

Jerusalem Cafe, and Alazzeh, who held a managerial role in the Cafe, paid the workers, in cash, at fixed weekly rates which did not vary based on overtime hours worked.

### 1. Workers

The six individuals who brought this suit are (1) Feliciano Macario, (2) Gonzalo Leal, (3) Elmer Lucas (Lucas), (4) Esvin Lucas (Esvin), (5) Margarito Rodas, and (6) Bernabe Villavicencio. Table 1 lists the jury's findings as to the workers' weekly hours, wages, and effective hourly wages during the period at issue in this case.

**Table 1**

|  | Weekly Hours | Weekly Wage | Effective Hourly Wage |
|---|---|---|---|
| **Feliciano Macario** |  |  |  |
| January 2008 to January 2010 | 77 | $300 | $3.90 |
| **Gonzalo Leal** |  |  |  |
| June 2007 to September 2008 | 77 | $420 | $5.45 |
| September 2008 to March 2010 | 77 | $500 | $6.49 |
| **Elmer Lucas** |  |  |  |
| June 2007 to March 2008 | 77 | $360 | $4.68 |
| March 2008 to September 2008 | 77 | $480 | $6.23 |
| September 2008 to September 2009 | 77 | $640 | $8.31 |
| September 2009 to March 2010 | 77 | $560 | $7.27 |
| **Esvin Lucas** |  |  |  |
| June 2007 to January 2010 | 66 | $550 | $8.33 |
| January 2010 to March 2010 | 60 | $500 | $8.33 |
| **Margarito Rodas** |  |  |  |
| June 2007 to September 2008 | 77 | $420 | $5.45 |
| September 2008 to March 2010 | 77 | $500 | $6.49 |
| **Bernabe Villavicencio** |  |  |  |
| June 2007 to July 2009 | 77 | $800 | $10.39 |
| July 2009 to March 2010 | 77 | $700 | $9.09 |

On January 23, 2010, Macario called the police after Azzeh's and Alazzeh's nephew allegedly struck him. Fearing the police would discover Azzeh employed illegal aliens, Azzeh offered Macario $500 to drop the charges and return to work. Macario refused. The employers terminated Macario in January 2010, and also terminated the other workers' employment in March 2010 after the other workers refused to falsify an employment application to make it appear they had not been working for the Cafe before March 2010.

### 2. Employers' Account

In the face of overwhelming evidence to the contrary, Azzeh claimed photos and videos of the workers performing tasks in the restaurant showed the workers "volunteering" and "posing for picture[s]." Azzeh also claimed the workers' food handler cards, issued by the Kansas City, Missouri, Health Department, see Kan. City, Mo., Food Code § 8-304.11(I)(2), and listing the Cafe as the workplace, were obtained in order to allow the workers to "volunteer" in the restaurant. Having observed the trial, the district court called the employers' account a "fantastic story."

## B. Procedural History

The workers filed an amended complaint in the Western District of Missouri on July 30, 2010, alleging the employers willfully failed to pay minimum and overtime wages in violation of the FLSA, 29 U.S.C. §§ 206(a), 207(a). On September 27, 2011, the district court granted the workers' motion in limine to preclude mention at trial of the workers' immigration status. The district court found the workers' immigration status "irrelevant" because they were seeking FLSA wages for previous work—not prospective relief, which would be unlawful under the Immigration Reform and Control Act of 1986 (IRCA), 8 U.S.C. § 1324a.

### 1. Trial

The district court held a four-day jury trial in November 2011. On the third day, Rodas testified during cross-examination that Azzeh "knew that he would get in

trouble if he would have hired *illegals like us*." (Emphasis added.) After discussion with counsel, the district court instructed the jury to "disregard the last statement made by this witness in its entirety." Later on the third day, during his cross-examination, Azzeh wished to answer the question why he kept no record of the workers' payments by testifying that he could not "I-9"[3] the workers. After discussion among counsel, the parties agreed to dissolve the order in limine, and the district court instructed the jury that the order had changed "in order to give . . . a clearer picture of what[] transpired here." Azzeh then testified he had never employed the workers—with the exception of Macario, whom he admitted hiring—because he "never hired illegals."

The jury found in the workers' favor. In accordance with the jury's verdict, the district court awarded $141,864.04 in actual damages for unpaid FLSA wages, $141,864.04 in liquidated damages based on the jury's finding that the employers willfully failed to pay FLSA wages, $150,627.00 in legal fees, and $6,561.63 in expenses.

### 2. Post-Trial Motions

The employers moved for judgment as a matter of law or a new trial, arguing the workers "as undocumented aliens" were "prohibited by law from receiving any wages . . . [and] lacked standing to sue for backpay under the [FLSA]." The district court rejected both arguments. First, denying the employers' motion for judgment as a matter of law, the district court found the standing argument was "a belated attempt by [the employers] to bring an affirmative defense" that the workers were not employed within the meaning of the FLSA, 29 U.S.C. § 203(e)(1). The employers waived that IRCA argument by failing to raise it until after trial, concluded the district court. On the question of Article III standing, which cannot be waived, the district

---

[3]The United States Citizenship and Immigration Services requires all employers to verify employment eligibility by properly completing a Form I-9, Employment Eligibility Verification Form, for each employee. See 8 C.F.R. § 274a.2.

court found the workers had standing to sue the employers because they (1) "suffered an injury in fact," (2) "this injury was the direct result of [the employers'] failure to pay the lawful wage," and (3) "the court's judgment will redress the [workers'] injuries."

Second, the district court denied the employers' motion for a new trial, finding no error in the order precluding any reference to the workers' immigration status. The district court observed that "virtually all of the courts that have considered th[e] issue" concluded immigration status "was irrelevant . . . because illegal aliens are not precluded from recovering unpaid wages under the FLSA." Even if its order were erroneous, the district court found the error would be harmless because the employers ultimately were able to discuss the workers' immigration status in the employer's case and argue they would not have hired unauthorized workers. Rejecting the employers' contention that they were prejudiced by their inability to discuss the workers' immigration status from the beginning, the district court explained the employers'

> testimony that they never employed the [workers], and that [the workers] simply occasionally "*volunteered*" to work at the restaurant without pay was contradicted by a mountain of more credible evidence, including a video of [the workers] working in the restaurant's kitchen and the testimony of two disinterested police officers who, in attempting to defuse a dispute, discussed with one of the [employers] how [the workers] would be paid for their last days at work. Thus, even had [the employers] been allowed to reference [the workers'] immigration status, the weight of the evidence *overwhelmingly established* that [the workers] were employees of the [employers], not volunteers.

(Second emphasis added). The employers filed a timely notice of appeal.

## II.   DISCUSSION

"We review *de novo* a denial of a motion for judgment as a matter of law," Marez v. Saint-Gobain Containers, Inc., 688 F.3d 958, 962 (8th Cir. 2012), and a decision that a plaintiff has standing, see Hargis v. Access Capital Funding, LLC, 674 F.3d 783, 790 (8th Cir. 2012).  We give "high deference" to a district court's denial of a motion for a new trial, reviewing it for an abuse of discretion.  PFS Distrib. Co. v. Raduechel, 574 F.3d 580, 592 (8th Cir. 2009).  We also "defer[] to a district court's familiarity with the details of the case and its greater experience in evidentiary matters," Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008), reversing a district court's evidentiary ruling "only if the . . . ruling was based on an erroneous view of the law or a clearly erroneous assessment of the evidence and affirmance would result in fundamental unfairness," Rodrick v. Wal-Mart Stores E., L.P., 666 F.3d 1093, 1096 (8th Cir. 2012) (internal quotation marks omitted) (quoting Wegener v. Johnson, 527 F.3d 687, 690 (8th Cir. 2008)).

### A.   FLSA Applicability to Unauthorized Aliens

The only circuit court to address the question directly, see Patel v. Quality Inn S., 846 F.2d 700 (11th Cir. 1988); numerous district courts, including the one in this case;[4] and the Secretary of Labor (Secretary) all agree: employers who unlawfully hire unauthorized aliens must otherwise comply with federal employment laws.  The employers' argument to the contrary rests on a legal theory as flawed today as it was in 1931 when jurors convicted Al Capone of failing to pay taxes on illicit income.[5]

---

[4]See, e.g., Chellen v. John Pickle Co., 446 F. Supp. 2d 1247, 1279-81, 1286 (N.D. Okla. 2006); Zavala v. Wal-Mart Stores, Inc., 393 F. Supp. 2d 295, 321-25 (D.N.J. 2005); Galaviz-Zamora v. Brady Farms, Inc., 230 F.R.D. 499, 501-03 (W.D. Mich. 2005); Flores v. Amigon, 233 F. Supp. 2d 462, 463-64 (E.D.N.Y. 2002); Singh v. Jutla & C.D. & R's Oil, Inc., 214 F. Supp. 2d 1056, 1060-62 (N.D. Cal. 2002); Liu v. Donna Karan Int'l, Inc., 207 F. Supp. 2d 191, 192 (S.D.N.Y. 2002).

[5]See Meyer Berger, Capone Convicted of Dodging Taxes; May Get 17 Years, N.Y. Times, October 17, 1931, available at http://www.nytimes.com/learning/general/onthisday/big/1017.html#article.

As Justice Oliver Wendell Holmes explained in <u>United States v. Sullivan</u>, 274 U.S. 259, 263 (1927), there is no "reason why the fact that a business is unlawful should exempt it from paying the taxes that if lawful it would have to pay." Here, too, there is no "reason why the fact that" the employers unlawfully hired the workers "should exempt" them "from paying the" wages "that if lawful" they "would have to pay." <u>Id.</u> "Certainly there is no reason for treating" the employers "more leniently." <u>Rutkin v. United States</u>, 343 U.S. 130, 137 (1952). Like the Eleventh Circuit, we hold that aliens, authorized to work or not, may recover unpaid and underpaid wages under the FLSA. <u>See</u> <u>Patel</u>, 846 F.2d at 706 ("[U]ndocumented workers are 'employees' within the meaning of the FLSA and . . . such workers can bring an action under the act for unpaid wages and liquidated damages.").

### 1. Plain Text of the FLSA

Because this case is one of statutory interpretation, our "starting point . . . is the existing statutory text." <u>Lamie v. U.S. Tr.</u>, 540 U.S. 526, 534 (2004). As to minimum wages, the text of the FLSA states "[e]very *employer* shall pay to each of his *employees* who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the [minimum wage rate]." 29 U.S.C. § 206(a) (emphasis added). The FLSA's overtime wage scheme is more complex, but the crux is simple: "[n]o employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." <u>Id.</u> § 207(a)(1).

The FLSA's sweeping definitions of "employer" and "employee" unambiguously encompass unauthorized aliens:

(d) "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when

-8-

acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

(e)(1) [With certain statutorily defined exceptions], the term "employee" means *any* individual *employed* by an employer.
. . . .

(g)  "Employ" includes to suffer or permit to work.

29 U.S.C. § 203(d), (e)(1), (g) (emphasis added).  During debate over the FLSA, then-Senator Hugo Black (who, shortly before his elevation to the Supreme Court, sponsored the bill that ultimately became the FLSA) called the FLSA's "definition of employee . . . the broadest definition that has ever been included in any one act."  81 Cong. Rec. 7656-57 (1937).

Importantly, Congress showed elsewhere in the statute that it "knows how to" limit this broad definition "when it means to," City of Milwaukee v. Illinois & Michigan, 451 U.S. 304, 329 n.22 (1981), and it did not do so with respect to unauthorized aliens. See 29 U.S.C. § 203(e).  The FLSA contains detailed limitations for certain governmental employees, see id. § 203(e)(2); family members engaged in agricultural work, see id. § 203(e)(3); state, local, and interstate governmental volunteers, see id. § 203(e)(4); and "individuals who volunteer their services solely for humanitarian purposes to private non-profit food banks and who receive from the food banks groceries," id. § 203(e)(5).  Nowhere in this list do we see any indication Congress meant to exclude unauthorized aliens from the FLSA's broad application to "any individual" whom an employer "suffer[s] or permit[s] to work."  Id. § 203(e)(1), (g).

As the Supreme Court has long emphasized, "where, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'"  United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917)).  Because the FLSA by its plain

terms protects aliens working without authorization, the employers' argument must fail unless the employers can point to a different statutory basis for limiting "the broadest definition that has ever been included in any one act," 81 Cong. Rec. at 7657.

### 2.    IRCA

The employers point to the Supreme Court's decision in Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137 (2002), for the proposition that the IRCA implicitly amended the FLSA to exclude unauthorized aliens. The employers misread Hoffman, ignore the relevant agency's reasonable interpretations of the FLSA and the IRCA, and "ascribe to Congress an intent at variance with the purpose[s] of th[e] statute[s]," Wyandotte Transp. Co. v. United States, 389 U.S. 191, 200 (1967).

### a.    Hoffman

In Hoffman, the Supreme Court held that unauthorized aliens may not receive backpay after being terminated for engaging in union activities protected by the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151-169. See Hoffman, 535 U.S. at 151-52. The issue in Hoffman was not, as the employers seem to think, whether the NLRA's broad definitions of "employer" and "employee," see 29 U.S.C. § 152, excluded unauthorized aliens from all protection by the National Labor Relations Board (NLRB). See Hoffman, 535 U.S. at 142-43. Rather, the question in Hoffman was whether the NLRB's remedial power extended far enough to "allow it to award backpay to an illegal alien for years of work *not* performed." Id. at 149 (emphasis added). Far from concluding the NLRA did not protect unauthorized aliens for work *actually* performed, the Hoffman court—after considering Congress's intervening enactment of the IRCA—reaffirmed its earlier holding in Sure-Tan, Inc. v. NLRB, 467 U.S. 883 (1984), that the NLRA applies to the *actual* employment of unauthorized aliens. See Hoffman, 535 U.S. at 151-52; Sure-Tan, 467 U.S. at 893-94.

Not only is our reading of Hoffman consistent with the overwhelming majority of post-Hoffman decisions by courts at every level, but "[n]o circuit court has reached

-10-

a contrary conclusion," Agri Processor Co. v. NLRB, 514 F.3d 1, 5-6 (D.C. Cir. 2008). In Madeira v. Affordable Hous. Found., Inc., 469 F.3d 219 (2d Cir. 2006), the Second Circuit explained:

> [A]n order requiring an employer to pay his undocumented workers the minimum wages prescribed by the [FLSA] for labor actually and already performed . . . . does not . . . condone that violation or continue it. It merely ensures that the employer does not take advantage of the violation by availing himself of the benefit of undocumented workers' past labor without paying for it in accordance with minimum FLSA standards.

Id. at 243. Interpreting an analogous definition of "employee" in Agri Processor, the D.C. Circuit found "absolutely no evidence that in passing IRCA Congress intended to repeal the NLRA to the extent its definition of 'employee' include[d] undocumented aliens." Agri Processor, 514 F.3d at 5.

Shortly after our court heard argument in this case, the Eleventh Circuit reaffirmed its decision in Patel "that undocumented aliens may recover their unpaid wages under the FLSA." Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299, 1306 (11th Cir. 2013). Rejecting arguments similar to those advanced by the employers here, the Eleventh Circuit concluded "the IRCA does not express Congress's clear and manifest intent to exclude undocumented aliens from the protection of the FLSA." Id. at 1308.

### b. Agency Interpretation

As the Secretary explains, there is no conflict between the FLSA and the IRCA. Both statutes work in tandem to discourage employers from hiring unauthorized workers by "assur[ing] that the wages and employment of lawful residents are not adversely affected by the competition of illegal alien employees who are not subject to the standard terms of employment," Sure-Tan, 467 U.S. at 893.

The Department of Labor's position that the FLSA applies to aliens without employment authorization is longstanding and consistent. In 1942, just four years after the FLSA's passage, the Department of Labor's "Wage and Hour Administrator opined that alien prisoners of war were covered by the [FLSA] and therefore were entitled to be paid the minimum wage." Patel, 846 F.2d at 703. Since then, in case after case, the Department of Labor has taken the same position it takes here.[6]

In the Secretary's amicus brief filed in this case, the Secretary explains that applying the FLSA to unauthorized aliens "is essential to achieving the purposes of the FLSA to protect workers from substandard working conditions, to reduce unfair competition for law-abiding employers, and to spread work and thereby reduce unemployment by requiring employers to pay overtime compensation." Given the Department's decades-long consistency and the Secretary's "specialized experience and broader investigations and information" in these matters, we think the Secretary's position is persuasive and merits Skidmore deference—to the extent there is any statutory ambiguity. Skidmore v. Swift & Co., 323 U.S. 134, 139 (1944); see also Godinez-Arroyo v. Mukasey, 540 F.3d 848, 850 (8th Cir. 2008).

---

[6]See, e.g., Patel, 846 F.2d at 703 ("The Department of Labor . . . supports Patel's position"); Donovan v. Burgett Greenhouses, Inc., 759 F.2d 1483, 1485 (10th Cir. 1985) (involving a suit by the Secretary of Labor in his official capacity to enforce the FLSA rights of "illegal aliens who were paid less than a dollar per hour and were not paid overtime compensation"); Brennan v. El San Trading Corp., 73 Lab. Cas. 33,032, 1973 WL 991, at *1 (W.D. Tex. Dec. 26, 1973) (addressing a suit by the Secretary in his official capacity); Dep't of Labor's Br., Josendis v. Wall to Wall Residence Repairs, Inc., No. 09-12266 (11th Cir. dated Aug. 26, 2010), available at http://www.dol.gov/sol/media/briefs/josendis(A)-8-26-2010.pdf; see also U.S. Dep't of Labor, Wage and Hour Div., "Fact Sheet #48: Application of U.S. Labor Laws to Immigrant Workers: Effect of Hoffman Plastics decision on laws enforced by the Wage and Hour Division" (rev. July 2008), available at https://www.dol.gov/whd/regs/compliance/whdfs48.pdf ("The Department's Wage and Hour Division will continue to enforce the FLSA . . . without regard to whether an employee is documented or undocumented.").

### c.    Congressional Purpose

We agree with the Secretary's position, independent of any deference to the Department of Labor's expertise, because Congress's purposes in enacting the FLSA and the IRCA are in harmony.   The IRCA unambiguously prohibits hiring unauthorized aliens, and the FLSA unambiguously requires that any unauthorized aliens—hired in violation of federal immigration law—be paid minimum and overtime wages.  The IRCA and FLSA together promote dignified employment conditions for those working in this country, regardless of immigration status, while firmly discouraging the employment of individuals who lack work authorization.  "If an employer realizes that there will be no advantage under the" FLSA "in preferring [unauthorized] aliens to legal resident workers, any incentive to hire such . . . aliens is correspondingly lessened."  Sure-Tan, 467 U.S. at 893.  Exempting unauthorized aliens from the FLSA would frustrate the purposes of the IRCA, for unauthorized workers' "acceptance . . . of jobs on substandard terms as to wages and working conditions can seriously depress wage scales and working conditions of citizens and legally admitted aliens."  De Canas v. Bica, 424 U.S. 351, 356-57 (1976).

Holding employers who violate federal immigration law and federal employment law liable for both violations advances the purpose of federal immigration policy by "offset[ting] what is perhaps the most attractive feature of [unauthorized] workers—their willingness to work for less than the minimum wage." Patel, 846 F.2d at 704.  For this reason, prohibiting employers from hiring unauthorized aliens is in harmony with requiring employers—including those who break immigration laws by hiring unauthorized workers—to provide fair working conditions and wages.  Both (1) the legislative history of the IRCA, which we reference "for those who find legislative history useful," United States v. Tinklenberg, 563 U.S. ___, ___, 131 S. Ct. 2007, 2015 (2011), and (2) "our steadfast canons of statutory construction," United States v. Johnson, 703 F.3d 464, 468 (8th Cir. 2013), confirm this point.

-13-

First, the House Committee on Education and Labor's report on the IRCA explained Congress did

> *not* intend that any provision of [the IRCA] would limit the powers of State or Federal labor standards agencies such as . . . *the Wage and Hour Division of the Department of Labor* . . . to remedy unfair practices committed against undocumented employees for exercising their rights before such agencies or for engaging in activities protected by these agencies. To do otherwise would be *counter-productive* of our intent to limit the hiring of undocumented employees and the depressing effect on working conditions caused by their employment.

H.R. Rep. No. 99-682(II), at 1 (1986), reprinted in 1986 U.S.C.C.A.N. 5757, 5758 (emphasis added). When Congress passed the IRCA, at least the authors of this report expected the FLSA would continue to protect unauthorized aliens from substandard working conditions and wages.

Second, § 111(d) of the IRCA "authorized to be appropriated, . . . *such sums as may be necessary* to the Department of Labor for enforcement activities of the *Wage and Hour Division* . . . in order to deter the employment of unauthorized aliens and *remove the economic incentive for employers to exploit and use such aliens*." Pub. L. No. 99-603, § 111(d), 100 Stat. 3359, 3381 (1986). Presuming, as the employers do, that the IRCA impliedly exempts unauthorized aliens from the protections of the FLSA would render this section "mere surplusage," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 174 (1803). No "sums" would "be necessary" to enforce the FLSA as to unauthorized aliens if the FLSA did not apply to their employment. § 111(d), 100 Stat. at 3381. A reading that turns an entire subsection into a meaningless aside "is inadmissible, unless the words require it." Marbury, 5 U.S. (1 Cranch) at 174. The IRCA's words do not require it, so "the presumption against surplusage [is] decisive." Johnson, 703 F.3d at 468.

For these reasons, we hold that unauthorized aliens may sue under the FLSA, 29 U.S.C. §§ 206(a), 207(a), 216(b), to recover statutory damages for work actually performed.

## B.      Standing

Because the FLSA gives the workers a right to sue the employers and obtain a real remedy for a statutory wrong, the workers have both Article III and prudential standing to recover damages from the employers.

### 1.      Article III Standing

The employers violated the FLSA by paying the workers substandard wages, which means the workers' suit to recover damages is a justiciable "Case[]" or "Controvers[y]" under Article III.  U.S. Const. art. III, § 2; see Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  First, the underpayment for *actual* work was "an 'injury in fact.'"  Id. at 560.  Second, that underpayment "fairly can be traced to the challenged action of the defendant[s]."  Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41 (1976).  Third, the district court's judgment, awarding actual and liquidated damages for the employers' FLSA violations, was a "favorable decision" providing "redress[]" in the form of financial damages.  Id. at 38.

### 2.      Prudential Standing

The employers did not raise their prudential standing argument until after the jury reached its verdict and the district court entered judgment in the workers' favor, so if a challenge alleging a lack of prudential standing is waivable, the employers resoundingly waived it.  See, e.g., Ensley v. Cody Res., Inc., 171 F.3d 315, 320 (5th Cir. 1999) (holding a defendant waived a challenge to prudential standing by objecting "too late," after the plaintiff's case-in-chief).  But our court has never directly decided whether prudential standing is a waivable exercise in judicial self-restraint or a jurisdictional bar "'determining the power of the court to entertain the

-15-

suit.'" <u>Urban Contractors Alliance of St. Louis v. Bi-State Dev. Agency</u>, 531 F.2d 877, 881 (8th Cir. 1976) (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975)).

Some of our cases have referred to prudential standing in jurisdictional terms. <u>See</u>, <u>e.g.</u>, <u>Delorme v. United States</u>, 354 F.3d 810, 815 (8th Cir. 2004) ("A party invoking federal jurisdiction must establish that he has met the requirements of both constitutional and prudential standing."); <u>Starr v. Mandanici</u>, 152 F.3d 741, 750 (8th Cir. 1998) ("Assuming, *arguendo*, that the Article III requirements of standing were fulfilled, this court still lacks jurisdiction because [the plaintiff] cannot satisfy the judicially-imposed prudential standing principles.").[7] Other cases have more carefully distinguished between jurisdictional power and self-imposed judicial restraint. <u>See</u>, <u>e.g.</u>, <u>Miller v. Redwood Toxicology Lab., Inc.</u>, 688 F.3d 928, 934 (8th Cir. 2012) ("'Constitutional and prudential standing are about, respectively, the constitutional power of a federal court to resolve a dispute and the wisdom of so doing.'" (quoting <u>Graden v. Conexant Sys., Inc.</u>, 496 F.3d 291, 295 (3d Cir. 2007)); <u>Cent. S. Dakota Co-op. Grazing Dist. v. Sec'y of the USDA</u>, 266 F.3d 889, 895 (8th Cir. 2001) ("The issue of standing implicates constitutional limitations on federal court jurisdiction and prudential limitations on the exercise thereof."); <u>cf.</u> <u>Henderson ex rel. Henderson v. Shinseki</u>, 562 U.S. ___, ___, 131 S. Ct. 1197, 1202-03 (2011) ("We have urged that a rule should not be referred to as jurisdictional unless it governs a court's *adjudicatory capacity*, that is, its subject-matter or personal jurisdiction." (emphasis added)).

---

[7]We do not read these case references to "jurisdiction" to have decided the question whether prudential standing governs our adjudicatory capacity. <u>See</u>, <u>e.g.</u>, <u>Delorme</u>, 354 F.3d at 817 (relying solely on an absence of "constitutional standing" to affirm dismissal). To the extent these cases turned on missing prudential standing, its absence gave us a reason to decline to *exercise* jurisdiction. <u>See</u>, <u>e.g.</u>, <u>Starr</u>, 152 F.3d at 750 ("[S]tanding 'involves both constitutional limitations on federal-court jurisdiction and *prudential* limitations on its *exercise*.'" (emphasis added) (quoting <u>Warth</u>, 422 U.S. at 498)).

We are reluctant—without the benefit of dedicated briefing, which the parties have not provided—to venture into the "deep and important circuit split on this important issue." Grocery Mfrs. Ass'n v. EPA, 693 F.3d 169, 185 (D.C. Cir. 2012) (Kavanaugh, J., dissenting). Compare id. at 172, 179-80 (majority opinion) (dismissing for "lack of jurisdiction" because of a failure "to demonstrate prudential standing"), with, e.g., Bd. of Miss. Levee Comm'rs v. EPA, 674 F.3d 409, 417 (5th Cir. 2012) ("Unlike constitutional standing, prudential standing arguments may be waived."); Rawoof v. Texor Petroleum Co., 521 F.3d 750, 756 (7th Cir. 2008) ("Prudential-standing doctrine is not jurisdictional in the sense that Article III standing is." (internal quotation omitted)); Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007) (same); Gilda Indus., Inc. v. United States, 446 F.3d 1271, 1280 (Fed. Cir. 2006) (holding the government defendant waived any challenge to the plaintiff's lack of prudential standing by failing to raise the issue in its brief). Though the prudential standing question lies near the heart of this case, we need not resolve the issue in order to resolve this appeal.

Regardless of any waiver by the employers, the workers have prudential standing. A plaintiff has prudential standing to bring a claim if "the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." Warth, 422 U.S. at 500. Here, Congress has spoken unambiguously: "[a]ny employer who violates the [minimum and overtime wage] provisions of [the FLSA] *shall* be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b) (emphasis added). Because the workers here are "employees" under the FLSA, see 29 U.S.C. § 203(e), they plainly fall within the "zone of interests protected or regulated by" § 216(b). Bennet v. Spear, 520 U.S. 154, 162 (1997).

## C.     Suppression of Evidence

Having decided the FLSA protects unauthorized aliens and the workers have standing to sue the employers for violating the FLSA, we swiftly reject the employers' challenge to the district court's decision to suppress evidence related to the workers' immigration status.

Our review of the district court's evidentiary rulings is highly deferential, "particularly . . . with respect to [Federal Rule of Evidence] 403" because the district court is better positioned than we are to weigh the probative value of a piece of evidence, in context, against its prejudicial effect.  Sprint/United, 552 U.S. at 384. Because the workers were seeking redress only for work actually performed, the district court reasonably concluded any reference to the workers' immigration status would be substantially more prejudicial than probative under Rule 403.

Even if the district court's exercise of discretion were ill-advised, "affirmance would [not] result in 'fundamental unfairness,'" Rodrick, 666 F.3d at 1096 (quoting Wegener, 527 F.3d at 690), because, as the district court reasoned, the "mountain of more credible evidence" supporting the workers' case towers over any potential harm. Furthermore, the order in limine was eventually dissolved, leaving the employers free to testify regarding the workers' lack of employment authorization, and the employers argued the Cafe never employed the workers because the employers "never hired illegals."

The employers have fallen well short of the threshold required for us to reverse the district court's evidentiary ruling.

## III.   CONCLUSION

Consistent with the principle that breaking one law does not give license to ignore other generally applicable laws, we affirm.

LOKEN, Circuit Judge, concurring.

I join Chief Judge Riley's thorough opinion for the court with the exception of Part II.A.2.c.

I also note that, as in <u>Lamonica v. Safe Hurricane Shutters, Inc.</u>, 711 F.3d 1299 (11th Cir. 2013), appellants have not challenged on appeal the award of liquidated damages under the Fair Labor Standards Act. We therefore do not consider that issue. But in my view, the question whether the Supreme Court's decision in <u>Hoffman Plastic Compounds, Inc. v. NLRB</u>, 535 U.S. 137 (2002), may require a modified analysis of the liquidated damages issue, at least in some cases, is not free from doubt. <u>See</u> <u>Madeira v. Affordable Housing Found., Inc.</u>, 469 F.3d 219, 255 (2d Cir. 2006) (Walker, J., concurring); <u>Rivera v. NIBCO, Inc.</u>, 384 F.3d 822, 833-35 (9th Cir. 2004) (Bea, J., dissenting from the denial of rehearing en banc).

_____