Opinion for the Court filed PER CURIAM.
Concurring opinion filed by Senior Circuit Judge SILBERMAN.
PER CURIAM:
In this case we consider challenges to EPA’s revised emissions standards for secondary lead smelting facilities. Finding petitioners’ claims unpersuasive, foreclosed by Circuit precedent, or otherwise barred from review, we deny in part and dismiss in part the petitions for review.
*670 I.
Section 112 of the Clean Air Act requires EPA to promulgate emissions standards for major sources of hazardous air pollutants (“HAPs”). 42 U.S.C. § 7412(d)(1). To do so, EPA calculates the “maximum achievable control technology” or “MACT,” a process that occurs in two stages. First, under CAA section 112(d)(3), EPA sets what it calls the “MACT floor” — certain minimum stringency requirements based on the amount of emissions reduction achieved in practice by the best performing sources. Id. § 7412(d)(3). Second, under section 112(d)(2), EPA “determines whether stricter standards, known as ‘beyond-the-floor’ limits, are achievable in light of the factors listed in [that provision].” Cement Kiln Recycling Coalition v. EPA 255 F.3d 855, 858 (D.C.Cir.2001) (per curiam); see 42 U.S.C. § 7412(d)(2).
Section 112(d)(6) requires EPA to “review, and revise as necessary (taking into account developments in practices, processes, and control technologies)” the emissions standards promulgated under section 112. 42 U.S.C. § 7412(d)(6). Section 112(f)(2) also requires EPA to review emissions standards to “consider whether residual risks [to public health or the environment] remain that warrant more stringent standards than achieved through MACT.” Sierra Club v. EPA, 353 F.3d 976, 980 (D.C.Cir.2004); see 42 U.S.C. § 7412(f)(2)(A).
In 2012, acting pursuant to sections 112(d)(6) and 112(f)(2), EPA revised the 1995 emissions standards for secondary lead smelting facilities, reducing allowable emissions by 90% — from the 2.0 milligrams per dry standard cubic meter (mg/dscm) previously permitted to 0.2 mg/dscm — and requiring smelters to totally enclose certain “fugitive” emission sources. See National Emissions Standards for Hazardous Air Pollutants from Secondary Lead Smelting (“Secondary Lead Rule”), 77 Fed. Reg. 556, 559, 564 (Jan. 5, 2012). Several industry groups and environmental groups filed petitions for review. Environmental and industry petitioners intervened as respondents in one another’s cases, and RSR Corporation intervened both as a petitioner and as a respondent.
II.
Industry petitioners first argue that the Secondary Lead Rule impermissibly regulates elemental lead as a HAP. Although EPA must regulate lead compounds as a HAP, see 42 U.S.C. § 7412(b)(1), the Clean Air Act prohibits EPA from listing or “in effect treat[ing]” elemental lead — or any criteria pollutant for which national ambient air quality standards (“NAAQS”) are promulgated — as a HAP under section 112, National Lime Association v. EPA, 233 F.3d 625, 638 (D.C.Cir.2000); see also 42 U.S.C. § 7412(b)(2) (“No [criteria pollutant] may be added to the list under this section ....”); id. § 7412(b)(7) (“The Administrator may not list elemental lead as a hazardous air pollutant under this subsection.”). Petitioners claim that the Rule violates this prohibition by (1) specifying a testing method that measures the mass of elemental lead (rather than the mass of lead compounds) in a source’s emissions; and (2) setting HAP emissions standards at levels designed to attain the primary lead NAAQS. As counsel for industry petitioners conceded at oral argument, see Oral Arg. Rec. 1:07:17-1:07:53, the first contention is time-barred because the 1995 emissions standards employed an identical testing method (Method 12) and that approach was not challenged in court at that time. See National Emission Standards for Hazardous Air Pollutants from Secondary Lead Smelting, 60 Fed. Reg. 32,- *671 587, 32,589 (June 23, 1995); 42 U.S.C. § 7607(b)(1) (requiring that any petition for review be filed within sixty days of publication in the Federal Register). The second contention also fails because the Rule sets HAP emissions standards at levels designed to attain the primary lead NAAQS, not the converse. The Rule in no way alters the NAAQS itself: it does not change the NAAQS level, impose an earlier NAAQS attainment date, or modify state implementation plans.
Industry petitioners next make a related argument that because, the Secondary Lead Rule “measure[s] lead compounds by reference to their elemental lead content and toxicity” — the .same methodology they claim is used to measure elemental lead in the prevention of significant deterioration (“PSD”) program — regulation of these substances under the PSD program is du-plicative and unlawful. Industry Petitioners’ Br. 30; see 42 U.S.C. § 7412(b)(6) (providing that PSD program shall not apply to HAPs listed under section 112). But we lack jurisdiction to consider this argument because EPA took no action with respect to the PSD program in this rulemaking.
Next, industry petitioners challenge EPA’s methodology for estimating fugitive emissions at secondary lead smelting facilities and EPA’s reliance on these estimates to conclude that total enclosure of fugitive emission sources was warranted. As EPA points out, however, industry petitioners “suggested in comments that any error in EPA’s methodology resulted in an underestimation of emissions from completely unenclosed facilities.” Respondents’ Br. 52. Thus, even if industry petitioners were correct, given that emissions from such facilities drove EPA’s finding of unacceptable risk, they would “have done no more than show that, the record even more fully supports the enclosure standard.” Respondents’ Br. 53. Accordingly, petitioners' lack standing to press this claim, because they have failed to show that, absent the alleged methodological error, “ ‘there is a substantial probability that they would not be injured and that, if the court affords the relief requested, the injury will be removed.’ ” Coalition for Responsible Regulation, Inc. v. EPA, 684 F.3d 102, 146 (D.C.Cir.2012) (per curiam) (quoting Chamber of Commerce v. EPA, 642 F.3d 192, 201 (D.C.Cir.2011)).
Industry petitioners’ challenge to the Rule’s requirement of lead continuous emissions monitoring systems (“CEMS”) fares no better. To begin with, any claim that the CEMS requirement is arbitrary and capricious is premature. EPA has yet to promulgate performance specifications for CEMS and, until it does, smelters have no obligation to install CEMS. See 40 C.F.R. § 63.548(i )(1) (requiring sources to install a lead CEMS “within 180 days” of promulgation of performance specifications). As petitioners themselves recognize, “without a [performance] specification it is impossible to determine whether lead CEMS will function appropriately in secondary lead smelters” or to ascertain “accurate cost information for the installation and operation of lead CEMS.” Industry Petitioners’ Br. 22, 23. This court would thus clearly “benefit from further factual development, of the issues” in connection with the performance specification rule-making. Ohio Forestry Association, Inc. v. Sierra Club, 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). With respect to petitioners’ procedural claim that the proposed rule referred to no “data in the record supporting the feasibility and cost-effectiveness of lead - CEMS that would allow for meaningful public comment,” Industry Petitioners’ Br. 23; see 42 U.S.C. § 7607(d)(3), EPA counsel.assured us at oral argument that stakeholders will *672 have the opportunity to challenge—and that EPA will reconsider imposing—the OEMS requirement itself in connection with the performance specification rule-making, and counsel for industry petitioners agreed that this resolves their concern, see Oral Arg. Rec. 47:41-48:48, 1:06:45-1:06:55.
We also reject industry petitioners’ contention that EPA’s refusal to consider granting existing sources up to three years to comply with the revised emissions standards under CAA section 112(i)(3) was arbitrary and capricious. See 42 U.S.C. § 7412(i)(3) (authorizing the Administrator to grant existing sources up to three years for compliance with emissions standards). EPA concluded that section 112(f)(4), which permits it to grant a waiver of no more than two years for compliance, see id. § 7412(f)(4), instead provided the governing framework for emissions standards promulgated under section 112(f), like those at issue here. This interpretation comports with the statute’s unambiguous language. Although section 112(i)(3)’s three-year maximum compliance period applies generally to “any emissions standard ... promulgated under [section 112];” id. § 7412(i)(3), section U2(f)(4)’s two-year maximum applies more specifically to standards “under this subsection,” i.e., section 112(f), id. § 7412(f)(4). It is a well-established principle of statutory construction that “‘[general language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment.’ ” RadLAX Gateway Hotel, LLC v. Amalgamated Bank, — U.S. —, 132 S.Ct. 2065, 2071, 182 L.Ed.2d 967 (2012) (alteration in original) (quoting D. Ginsberg & Sons, Inc. v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704 (1932)). Because Congress clearly intended to grant existing sources no more than two years to comply with standards promulgated under section 112(f), that is the end of the matter. See Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
Equally without merit is industry petitioners’ claim that EPA’s decision to revise emissions standards under section 112(d)(6) was arbitrary and capricious. Although petitioners contend that EPA failed to consider public health objectives or other controls imposed on emissions sources in determining whether more stringent standards were “necessary,” nothing in section 112(d)(6)’s text suggests that EPA must consider such factors. To the contrary, the statute directs EPA to “tak[e] into account developments in practices, processes, and control technologies,” 42 U.S.C. § 7412(d)(6), not public health objectives or risk reduction achieved by additional controls.
III.
We turn next to environmental petitioners’ challenge and begin with Article III standing. Contrary to industry inter-venors’ claim, environmental petitioners have shown that their members “would have standing under Article III to sue in [their] own right,” as required to establish associational standing. NRDC v. EPA, 489 F.3d 1364, 1370 (D.C.Cir.2007). Several members aver that they live or work in close proximity to smelters and have reduced their time outdoors in response to concerns about pollution—precisely the kinds of harms the Supreme Court has deemed sufficient to show injury in fact. See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (“[Environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and *673 are persons ‘for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.’ ” (quoting Sierra Club v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972))); Theresa Cano Decl. ¶¶ 3, 13-15; Michael Mullen Decl. ¶¶ 3, 5-7; Thad Carlson Decl. ¶¶ 3-4, 6-7; Jennifer McLellan Decl. ¶¶ 3-6. Moreover, were we to require EPA “to regulate the HAPs to which [their] members are exposed more stringently than the agency has already purported to do,” as petitioners ask, this alleged injury would likely be redressed. Sierra Club v. EPA, 699 F.3d 530, 533 (D.C.Cir.2012).
Environmental petitioners’ challenge, however, fails on the merits. Their primary argument is that, when EPA revises emissions standards under section 112(d)(6), it must recalculate the maximum achievable control technology in accordance with sections 112(d)(2) and (d)(3). This argument, although far better developed than the identical claim in NRDC v. EPA, 529 F.3d 1077 (D.C.Cir.2008), is barred by that decision. There, we explained that section 112(d)(6) could not “be construed reasonably as imposing” an obligation on EPA “to completely recalculate the maximum achievable control technology” when it revises standards under that provision. Id. at 1084. Seeking to dismiss that statement as dictum, environmental petitioners argue that the NRDC panel had no occasion to decide the legal test applicable to a section 112(d)(6) revision because EPA, having found “no ‘significant developments in practices, processes, and control technologies,’ ” never promulgated revised standards in that rulemaking. Id. (quoting National Emission Standards for Organic Hazardous Air Pollutants From the Synthetic Organic Chemical Manufacturing Industry, 71 Fed. Reg. 76,603, 76,-605 (Dec. 21, 2006)). But the panel rested its decision on two independent conclusions: that section 112(d)(6) imposes no obligation to recalculate the MACT and that “[e]ven if the statute did impose such an obligation, petitioners have not identified any post-1994 technological innovations that EPA has overlooked.” Id. Where, as in that case, “there are two grounds, upon either of which an appellate court may rest its decision, and it adopts both, ‘the ruling on neither is obiter [dictum], but each is the judgment of the court, and of equal validity with the other.’ ” United States v. Title Insurance & Trust Co., 265 U.S. 472, 486, 44 S.Ct. 621, 68 L.Ed. 1110 (1924) (quoting Union Pacific Railroad Co. v. Mason City & Fort Dodge Railroad Co., 199 U.S. 160, 166, 26 S.Ct. 19, 50 L.Ed. 134 (1905)).
Environmental petitioners next argue that EPA impermissibly considered cost in revising emissions standards under section 112(d)(6). But the statute only bars cost consideration in setting MACT floors under section 112(d)(3), see National Lime, 233 F.3d at 640; section 112(d)(2) in contrast expressly directs EPA to consider costs when setting beyond-the-floor standards, see 42 U.S.C. § 7412(d)(2) (directing the Administrator to “tak[e] into consideration the cost of achieving ... emission reduction”). Petitioners are correct that section 112(d)(6) itself makes no reference to cost and that the Supreme Court has “refused to find implicit in ambiguous sections of the [Clean Air Act] an authorization to consider costs that has elsewhere, and so often, been expressly granted.” Whitman v. American Trucking Associations, Inc., 531 U.S. 457, 467, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). But given that EPA has no obligation to recalculate the MACT floor when revising standards, see supra at 672-73, and given that section 112(d)(2) expressly authorizes cost consideration in other aspects of the standard- *674 setting process, we believe this clear statement rule is satisfied.
Finally, environmental petitioners have failed to show that EPA acted arbitrarily and capriciously when it decided not to impose more stringent emissions standards based on certain technological developments — namely, high efficiency particulate air (“HEPA”) filters and wet electrostatic precipitators (“WESP”). EPA reasonably explained that further reductions were unwarranted due to concerns about the feasibility, utility, cost-effectiveness, and adverse collateral environmental impacts associated with this technology, and petitioners point to no “clear error of judgment” reflected in this reasoning. Defenders of Wildlife v. Salazar, 651 F.3d 112, 116 (D.C.Cir.2011).
IV.
With the exception of RSR’s challenge to the CEMS requirement, which we reject for the same reasons as industry petitioners’ identical claim, see supra at 671-72, RSR challenges only EPA’s failure to require that more stringent standards be imposed on the company’s competitors. According to industry intervenors, RSR lacks prudential standing to bring those claims. See In re Vitamins Antitrust Class Actions, 215 F.3d 26, 29 (D.C.Cir.2000) (explaining that potential intervenors must demonstrate prudential standing). Because this Circuit treats prudential standing as “a jurisdictional issue which cannot be waived or conceded,” Animal Legal Defense Fund, Inc. v. Espy, 29 F.3d 720, 723 n. 2 (D.C.Cir.1994); see also Grocery Manufacturers Association v. EPA, 693 F.3d 169, 174, 179 (D.C.Cir.2012), we must consider this argument even though it was raised only by industry intervenors, see U.S. Telephone Association v. FCC, 188 F.3d 521, 531 (D.C.Cir.1999) (explaining the general “rule against consideration of issues raised by interve-nors and not by petitioners”). Under our case law, RSR lacks prudential standing because an industry group’s interest in “increasing the regulatory burden on others” falls outside the “zone of interests” protected by the Clean Air Act. Cement Kiln, 255 F.3d at 870-71. RSR nonetheless insists that it has prudential standing because it “is regulated by the very standards it is challenging.” RSR Petitioner-Intervenor Reply Br. 5. But apart from the CEMS requirement, RSR objects not to any regulatory burden imposed on it but instead to the absence of regulatory burdens imposed on its competitors.
V.
For the foregoing reasons, the petitions for review are denied in part and dismissed in part.

So ordered.