KAVANAUGH, Circuit Judge,
concurring in part and dissenting in part:
Suppose you were the EPA Administrator. You have to decide whether to go forward with a proposed air quality regulation. Your only statutory direction is to decide whether it is “appropriate” to go forward with the regulation. Before making that decision, what information would you want to know? You would certainly want to understand the benefits from the regulations. And you would surely ask how much the regulations would cost. You would no doubt take both of those considerations — benefits and costs — into account *1259 in making your decision. That’s just common sense and sound government practice.
So it comes as a surprise in this case that EPA excluded any consideration of costs when deciding whether it is “appropriate” — the key statutory term — to impose significant new air quality regulations on the Nation’s electric utilities. In my view, it is unreasonable for EPA to exclude consideration of costs in determining whether it is “appropriate” to impose significant new regulations on electric utilities. To be sure, EPA could conclude that the benefits outweigh the costs. But the problem here is that EPA did not even consider the costs. And the costs are huge, about $9.6 billion a year — that’s billion with a b — by EPA’s own calculation.
In Part I of this opinion, I explain my respectful disagreement with the majority opinion’s decision to uphold EPA’s exclusion of cost from its decisionmaking under this statutory provision.
In Part II of this opinion, I write to address this Court’s case law applying the “zone of interests” test under the Administrative Procedure Act. I accept the majority opinion’s conclusion that petitioner Ju-lander Energy Corporation — a natural gas company challenging EPA’s allegedly unlawful under-regulation of Julander’s competitor coal and oil companies — does not fall within the “zone of interests” of the Clean Air Act, at least as the zoné of interests test has been applied by some decisions of this Court. But those decisions are inconsistent with other decisions of this Court and, more importantly, are incompatible with a 40-year string of Supreme Court decisions applying the “zone of interests” test. Put simply, our case law applying the zone of interests test is in a state of disorder and needs to be cleaned up in the near future.
I
These consolidated cases concern EPA’s Final Rule, “National Emission Standards for Hazardous Air Pollutants From Coal- and Oil-Fired Electric Utility Steam Generating Units,” 77 Fed.Reg. 9304 (Feb. 16, 2012). The Rule implements provisions of the Clean Air Act, 42 U.S.C. § 7401 et seq., regarding emissions of hazardous air pollutants.
As the majority opinion recounts, the Clean Air Act originally provided EPA substantial discretion to identify and regulate pollution from sources emitting hazardous air pollutants. That approach proved to be time-consuming and largely unworkable, so in 1990 Congress amended the Act to cabin much of EPA’s discretion. The 1990 amendments required EPA to identify stationary sources of 189 enumerated hazardous air pollutants and to adopt standards for limiting emissions of those pollutants from those sources. See 42 U.S.C. § 7412.[1] Those technology-based standards are commonly referred to as the “maximum achievable control technology,” or MACT, standards.
EPA uses a two-step process for setting MACT standards. It begins by setting a minimum stringency level, or “floor,” based on the performance of the best-performing units in a particular source category. See id. § 7412(d)(3). At that first step, EPA may not consider costs. Once the agency sets the statutory floor, it *1260 then determines, considering cost and the other factors listed in Section 112(d)(2), whether an even more restrictive standard is “achievable.” Id. § 7412(d)(2). EPA refers to these stricter requirements as “beyond-the-floor” standards.
The two-step process outlined in Section 112(d) — what I will call the MACT program — applies automatically to most sources of hazardous air pollutants.
But for one category of sources — electric utilities — Congress devised an alternative system as set forth in Section 112(n)(l)(A) of the Act.[2] That alternative system erects two threshold hurdles before EPA may regulate electric utilities under the MACT program. First, Congress required EPA to “perform a study of the hazards to public health reasonably anticipated to occur as a result of emissions by” electric utilities and report the results of the study to Congress within three years of the enactment of the amendments. Id. § 7412(n)(l)(A). Second, Congress provided that after the study was completed, EPA could regulate electric utilities under the MACT program only “if the Administrator finds such regulation is appropriate and necessary after considering the results of the study.” Id. (emphasis added).[3]
The meaning of Section 112(n)(l)(A)— particularly the term “appropriate” — is a critical question in this litigation. Industry petitioners and EPA dispute whether EPA, when determining whether regulation of electric utilities under the MACT program is “appropriate,” must consider the cost to industry and the public from regulating electric utilities under that program.[4]
EPA thinks not. EPA acknowledges that, in the past, it has interpreted and applied the word “appropriate” in this statute to provide for the consideration of costs. See 70 Fed.Reg. 15,994, 16,001 & n. 19 (Mar. 29, 2005). But the agency has changed its interpretation. EPA’s position now is that EPA may reasonably exclude consideration of costs in determining whether it is “appropriate” to regulate electric utilities under the MACT program. The majority opinion upholds EPA’s interpretation.
I respectfully disagree with the majority opinion. It is certainly true, as the majority opinion states, that the word “appropriate” is ambiguous in isolation, and that an agency’s reasonable interpretation of an ambiguous statutory term is permissible. See Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 *1261 (1984). But the agency’s answer must be “a permissible construction of the statute” — or put another way, the agency’s interpretation of the ambiguity must be reasonable. Id. at 848, 104 S.Ct. 2778. Moreover, under the APA, an agency must consider the relevant factors when exercising its discretion under the governing statute. See Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 42-43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).
In this case, whether one calls it an impermissible interpretation of the term “appropriate” at Chevron step one, or an unreasonable interpretation or application of the term “appropriate” at Chevron step two, or an unreasonable exercise of agency discretion under State Farm, the key point is the same: It is entirely unreasonable for EPA to exclude consideration of costs in determining whether it is “appropriate” to regulate electric utilities under the MACT program.
To begin with, consideration of cost is commonly understood to be a central component of ordinary regulatory analysis, particularly in the context of health, safety, and environmental regulation. And Congress legislated against the backdrop of that common understanding when it enacted this statute in 1990. Put simply, as a matter of common sense, common parlance, and common practice, determining whether it is “appropriate” to regulate requires consideration of costs.
Drawing on his extensive administrative law and regulatory experience, not to mention his experience as a jurist, Justice Breyer has perhaps best explained the centrality of cost consideration to proper regulatory decisionmaking. In order “better to achieve regulatory goals — for example, to allocate resources so that they save more lives or produce a cleaner environment — regulators must often take account of all of a proposed regulation’s adverse effects.” Whitman v. American Trucking Associations, 531 U.S. 457, 490, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (Breyer, J., concurring). That is so because “every real choice requires a decisionmaker to weigh advantages against disadvantages, and disadvantages can be seen in terms of (often quantifiable) costs.” Entergy Corp. v. Riverkeeper, Inc., 556 U.S. 208, 232, 129 S.Ct. 1498, 173 L.Ed.2d 369 (2009) (opinion of Breyer, J.). Cost is a particularly salient consideration for administrative agencies today, “in an age of limited resources available to deal with grave environmental problems, where too much wasteful expenditure devoted to one problem may well mean considerably fewer resources available to deal effectively with other (perhaps more serious) problems.” Id. at 233, 129 S.Ct. 1498. An “absolute prohibition” on considering costs “would bring about irrational results.... [I]t would make no sense to require plants to spend billions to save one more fish or plankton. That is so even if the industry might somehow afford those billions.” Id. at 232-33, 129 S.Ct. 1498 (internal citation and quotation marks omitted).
In addition to Justice Breyer, many other leading jurists and scholars on administrative law have likewise recognized that cost generally has to be a relevant factor in the overall regulatory mix. Consider the following:
Justice Kagan: “[W]hat does it take in a statute to make us say, look, Congress has demanded that the regulation here occur without any attention to costs? In other words, essentially, Congress has demanded that the regulation has occurred in a fundamentally silly way.” Transcript of Oral Argument at 13, EPA v. EME Homer City *1262 Generation, L.P., No. 12-1182 (U.S. Dec. 10, 2013).[5]
• Professor Sunstein: “Without some sense of both costs and benefits — both nonmonetized and monetized — regulators will be making a stab in the dark.” Cass R. Sunstein, Cost-Benefit Analysis and the Environment, Ethics 351, 354 (2005).
• Professor Sunstein: “A rational system of regulation looks not at the magnitude of the risk alone, but assesses the risk in comparison to the costs.” Cass R. Sunstein, Interpreting Statutes in the Regulatory State, 103 Habv. L.Rev. 405, 493 (1989).
• Professor Sunstein: “[A]ny reasonable judgment will ordinarily be based on some kind of weighing of costs and benefits, not on an inquiry into benefits alone.... If the costs would be high and the benefits low, on what rationale should ... the EPA refuse even to consider the former? There appears to be no good answer. If there is not, the agency’s interpretations should be declared unreasonable.” Cass R. Sun-stein, Cost-Benefit Default Principles, 99 Mich. L.Rev. 1651,1694 (2001).
• Professors Revesz and Livermore: “For certain kinds of governmental programs, the use of cost-benefit analysis is a requirement of basic rationality.” RichaRD L. Revesz & Michael A. LIVERMORE, RETAKING RATIONALITY 12 (2008).
• Professor Pierce: “All individuals and institutions naturally and instinctively consider costs in making any important decision.... [I]t is often impossible for a regulatory agency to make a rational decision without considering costs in some way.” Richard J. Pierce, Jr., The Appropriate Role of Costs in Environmental Regulation, 54 Admin. L.Rev. 1237, 1247 (2002).
Every presidential administration for more than three decades has likewise made analysis of costs an integral part of the internal Executive Branch regulatory process. See generally Helen G. Boutrous, Regulatory Review in the Obama Administration: Cosh-Benefit Analysis for Everyone, 62 Admin. L.Rev. 243, 246-48 (2010). Most recently, in 2011, President Obama issued Executive Order 13,563, which follows an earlier Order issued by President Clinton and followed by President George W. Bush. The Order directs each agency “to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible.” 76 Fed.Reg. 3821, 3821 (Jan. 21, 2011). Under President Obama’s Executive Order, agencies may proceed with proposed regulations only if the benefits justify the costs. Id.
To be clear, Congress may itself weigh the costs of a particular kind of regulation, or otherwise take costs out of the equation, when assigning authority to executive and independent agencies to regulate a particular industry or in a particular area. See Whitman v. American Trucking Associations, 531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (statutory provision does not include consideration of costs). And even when an agency has to take costs into account, it of course may conclude that the benefits of a proposed regulation outweigh the costs. Moreover, different agency heads, and different Presidents, may as *1263 sess and weigh certain benefits and costs differently depending on their overarching philosophies.
But when considering just as a general matter whether it is “appropriate” to regulate, it is well-accepted that consideration of costs is a central and well-established part of the regulatory decisionmaking process.
But EPA did not consider costs here. And EPA’s failure to do so is no trivial matter. The estimated cost of compliance with EPA’s Final Rule is approximately $9.6 billion per year, by EPA’s own calculation. 77 Fed.Reg. at 9306, Table 2. To put it in perspective, that amount would pay the annual health insurance premiums of about two million Americans. It would pay the annual salaries of about 200,000 members of the U.S. Military. It would cover the annual budget of the entire National Park Service three times over. Put simply, the Rule is “among the most expensive rules that EPA has ever promulgated.” JaMes E. MoCaethy, CoNGRESSIONAL RESEARCH SERVICE, R42144, EPA’s Utility Mact: Will the Lights Go Out? 1 (2012).
EPA calculated the $9.6 billion cost figure as part of its Regulatory Impact Analysis accompanying the Rule. That Regulatory Impact Analysis was required by President Obama’s Executive Order. Yet EPA’s official position in this Court is that the costs identified in the Regulatory Impact Analysis should have “no bearing on” the determination of whether regulation is appropriate. EPA Br. 55.
On the other side of the ledger, the benefits of this Rule are disputed: Industry petitioners focus on the reduction in hazardous air pollutant emissions attributable to the regulations, which amount to only $4 to $6 million dollars each year. See 77 Fed.Reg. at 9428; State, Industry & Labor Br. 21. If those figures are right, the Rule costs nearly $1,500 for every $1 of health and environmental benefit produced. For its part, EPA says it would estimate the benefits at $37 to $90 billion dollars based on what it says are the indirect benefits of reducing PM2.5, a type of fine particulate matter that is not itself regulated as a hazardous air pollutant. See 77 Fed.Reg. at 9428.
To be sure, as I have said, EPA may be able to conclude that the benefits outweigh the costs in determining whether it is “appropriate” to regulate electric utilities under the MACT program. But to reiterate, that’s not what EPA has done in this Rule. Rather, according to EPA, it is irrelevant how large the costs are or whether the benefits outweigh the costs in determining whether it is “appropriate” to regulate electric utilities under the MACT program.
In response to petitioners’ claim that the legal issue here has huge real-world consequences, the majority opinion suggests that it may not matter all that much that EPA refused to consider costs in deciding whether it is “appropriate” to regulate electric utilities under the MACT program, because EPA does account for costs in the second step of the MACT program, when EPA sets “beyond-the-floor” standards. Maj. Op. at 1240. I respectfully find that to be a red herring. After all, once EPA determines that it is appropriate to regulate electric utilities under the MACT program, costs are not relevant at the first, “setting the floor” stage of the MACT program. And meeting that floor will be prohibitively expensive, particularly for many coal-fired electric utilities, regardless of whether EPA decides to go further and set a “beyond-the-floor” standard. So in the real world in which electric utilities operate, the financial burden of complying with that first “setting the floor” step of the MACT program — where costs are not *1264 considered — will likely knock a bunch of coal-fired electric utilities out of business and require enormous expenditures by other coal and oil-fired electric utilities. Telling someone that costs will be considered in a regulatory step that occurs after they have already had to pay an exorbitant amount and may already have been put out of business is not especially reassuring. The majority opinion’s attempt to downplay the effects of its decision thus rings a bit hollow.
In downplaying the issue here, the majority opinion also says that the result of this case is that electric utilities will just be treated like other sources. In saying that, the majority opinion, in my respectful view, does not sufficiently account for the fact that treating electric utilities differently from standard sources was the intent of Section 112(n)(l)(A), as revealed by the statutory text. If Congress had intended EPA to consider the costs of regulating electric utilities only when deciding whether to adopt beyond-the-floor standards, and not as a threshold decision in deciding whether to regulate electric utilities under the MACT program to begin with, it would have done one of two things: It would have either automatically regulated electric utilities under the MACT program, as it did with other sources, or provided that regulation under the MACT program would be automatic if the three-year study found that these sources indeed emitted hazardous air pollutants. That Congress declined to choose either of those options, and instead directed EPA to regulate electric utilities under the MACT program only if “appropriate,” reinforces the conclusion that Congress intended EPA to consider costs in deciding whether to regulate electric utilities at the threshold, and not simply at the second beyond-the-floor stage of the MACT program.
Not only does EPA’s approach depart from the clear statutory scheme, standard agency decisionmaking, and the common understanding of the term “appropriate” in this regulatory context, it also effectively negates the congressional compromise that was ultimately embodied in the statutory text of the 1990 Act. Under the initial Senate proposal, electric utilities would been have listed as sources under Section 112(c) and therefore automatically regulated under Section 112(d), the MACT program. See 3 A Legislative History of the Clean Air Act Amendments of 1990, at 4119, 4418-28 (1993). But the House subsequently modified the Senate bill to make regulation of electric utilities under the MACT program dependent on the results of a study and the Administrator’s subsequent determination that regulation was “appropriate” and necessary. See 2 id. at 2148-49. In the words of the House bill’s legislative sponsor, Congressman Oxley, the goal of the counter-proposal was to provide “protection of the public health while avoiding the imposition of excessive and unnecessary costs on residential, industrial, and commercial consumers of electricity.” See 1 id. at 1417 (emphasis added). The House’s proposal ultimately prevailed with the Conference Committee “because of ... the extremely high costs that electric utilities will face under other provisions of the new Clean Air Act amendments.” Id. at 1416. That Conference Committee view — that EPA should avoid imposing unwarranted financial burdens when deciding to regulate electric utilities — is encapsulated in the textual directive that EPA regulate electric utilities under the MACT program only if “appropriate.”
The majority opinion here says that the term “appropriate” is ambiguous. But the Supreme Court often looks to legislative history to help inform interpretation of otherwise ambiguous statutes, including in *1265 Chevron cases. See Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. 2778. And here, the legislative history should resolve any lingering ambiguity on the key point of what “appropriate” encompasses. It establishes that Congress in 1990 chose to impose these threshold requirements on EPA specifically because it wanted EPA to consider costs before regulating electric utilities under the MACT program. EPA’s interpretation of Section 112(n)(l)(A) in this case upsets Congress’s earefiil balance and stacks the deck in favor of regulation of electric utilities under the MACT program. In effect, EPA’s reading of the statute replaces its authority to regulate electric utilities if “appropriate” with a command to regulate electric utilities under the MACT program regardless of costs. That is not what Congress intended or permitted and thus is beyond EPA’s authority. See Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. 2778.
In upholding EPA’s cost-blind approach, the majority opinion points to other statutory provisions that expressly reference cost and invokes the familiar interpretive canon that “[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.” Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). The majority opinion assigns particular weight to the Supreme Court’s decision in Whitman v. American Trucking Associations, 531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001), which referenced that canon when construing a different section of the Clean Air Act. See Whitman, 531 U.S. at 467, 121 S.Ct. 903 (“We have therefore refused to find implicit in ambiguous sections of the CAA an authorization to consider costs that has elsewhere, and so often, been expressly granted.”). As in Whitman, according to the majority opinion, Congress’s decision not to explicitly mention cost in Section 112(n)(l)(A), despite doing so in other parts of the Act, creates a negative implication that costs are an unnecessary consideration.
But I respectfully believe the majority opinion is misreading — or at least over-reading — Whitman. Whitman was a tex-tualist decision written for a unanimous Court by Justice Scalia. It stands for the basic proposition that consideration of costs cannot be jammed into a statutory factor that, by its terms, otherwise would not encompass “costs,” particularly when other provisions of the Act expressly reference costs. See Entergy, 556 U.S. at 223, 129 S.Ct. 1498 (Whitman “stands for the rather unremarkable proposition that sometimes statutory silence, when viewed in context, is best interpreted as limiting agency discretion.”).
In Whitman itself, the statutory factor was a provision of the Clean Air Act, Section 109(b)(1), that directed EPA to set ambient air quality standards at levels “requisite to protect the public health” with “an adequate margin of safety.” 42 U.S.C. § 7409(b)(1). The dispute concerned whether those “modest words” granted EPA “the power to determine whether implementation costs should moderate national air quality standards.” 531 U.S. at 468, 121 S.Ct. 903. Concluding that EPA had not been granted such power, the Court speaking through Justice Scalia observed that cost “is both so indirectly related to public health and so full of potential for canceling the conclusions drawn from direct health effects that it would surely have been expressly mentioned in §§ 108 and 109 had Congress meant it to be considered.” Id. at 469, 121 S.Ct. 903.
*1266 The statutory provision at issue in Whitman differs significantly from the statute at issue here. The statutory provision in Whitman tied regulation solely to “public health,” which is typically a critical factor on the other side of the balance from costs, not a factor that includes costs. Here, by contrast, the key statutory term is “appropriate” — the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors, health and safety benefits on the one hand and costs on the other. To unblinkingly rely on Whitman here is to overlook the distinct language of the relevant statutes. Cf Michigan v. EPA, 213 F.3d 663, 677-79 (D.C.Cir.2000) (the term “significant” “does not in itself convey a thought that significance should be measured in only one dimension,” and in “some contexts, ‘significant’ begs a consideration of costs”).
To sum up: All significant regulations involve tradeoffs, and I am very mindful that Congress has assigned EPA, not the courts, to make many discretionary calls to protect both our country’s environment and its productive capacity. In this case, if EPA had decided, in an exercise of its judgment, that it was “appropriate” to regulate electric utilities under the MACT program because the benefits outweigh the costs, that decision would be reviewed under a deferential arbitrary and capricious standard of review. See American Radio Relay League, Inc. v. FCC, 524 F.3d 227, 247-48 (D.C.Cir.2008) (separate opinion of Kavanaugh, J.). But before we assess the merits of any cost-benefit balancing, this statutory scheme requires that we first ensure that EPA has actually considered the costs. See State Farm, 463 U.S. at 42-43, 103 S.Ct. 2856. In my view, whether we call it a Chevron problem or a State Farm problem, it is unreasonable for EPA to exclude consideration of costs when deciding whether it is “appropriate” to regulate electric utilities under the MACT program. I respectfully dissent from the majority opinion’s contrary conclusion.[6]
II
This case implicates another important administrative law issue, the “zone of interests” test under the Administrative Procedure Act.[7] The Court holds that petitioner Julander Energy Company falls outside the “zone of interests” the Clean Air Act is designed to protect and thus cannot chal *1267 lenge the Final Rule. The Court reasons that the concerns raised by Julander, a natural gas production company, are merely to seek more stringent regulation of its coal and oil company competitors. See Maj. Op. at 1256.
I reluctantly join that portion of the Court’s opinion because it is consistent with some of this Court’s previous decisions applying the zone of interests test. I hasten to add that the decisions on which the Court today relies are inconsistent with other of this Court’s precedents. Given that our case law makes this issue a de facto coin flip, I cannot fault an opinion that lands on heads rather than tails.
I am concerned, however, about the erratic inconsistency in our case law. I am even more concerned that our cases holding that competitors are outside the zone of interests — including today’s decision— are inconsistent with the governing Supreme Court precedents. I write separately to explain my concerns.
The Supreme Court first announced the APA “zone of interests” test in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (Data Processing). In that case, vendors of data processing services challenged the Comptroller of the Currency’s decision to allow competitor national banks to sell the same services. The data processing vendors alleged that the agency decision violated a provision of the National Bank Act. The district court dismissed the case for lack of standing, and the court of appeals affirmed the dismissal. The Supreme Court reversed. For purposes of Article III standing, the Court first said that there was “no doubt” that the petitioners had alleged a sufficient “injury in fact.” Id. at 152, 90 S.Ct. 827. In reaching that conclusion, the Court rejected the then-prevailing requirement that plaintiffs show that a defendant’s actions invaded a “legal interest” belonging to the plaintiff. Id. at 153, 90 S.Ct. 827. The Court instead adopted the now-familiar “injury in fact” test.
For purposes of the APA, the Court added that the separate question of being able to sue under the APA “concerns, apart from the ‘case’ or ‘controversy’ test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.” Id. And the Court said that the “zone of interests” requirement was satisfied by the plaintiffs in Data Processing, who were competitors of the national banks. The Court noted with approval the “trend ... toward enlargement of the class of people who may protest administrative action.” Id. at 154, 90 S.Ct. 827. In keeping with that trend, the Court refused to take an overly restrictive view of “the generous review provisions” of the APA, which the Court noted should be construed “not grudgingly but as serving a broadly remedial purpose.” Id. at 156, 90 S.Ct. 827.[8]
The Supreme Court reaffirmed its broad understanding of the zone of interests test in Arnold Tours, Inc. v. Camp, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970) and Investment Company Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). The plaintiffs in both cases were *1268 competitors of national banks. Both cases concerned decisions by the Comptroller of the Currency to authorize national banks to offer new services to customers: travel services in Arnold, Tours and investment services in Investment Company Institute. And in both cases, the Court held that plaintiffs who would have to compete with the banks under the new regulations satisfied the zone of interests test and could challenge the Comptroller’s decision. See Arnold Tours, 400 U.S. at 46, 91 S.Ct. 158; Investment Company Institute, 401 U.S. at 620-21, 91 S.Ct. 1091.
Notably, Justice Harlan dissented in Investment Company Institute because there was no evidence of “any congressional concern for the interests of petitioners and others like them in freedom from competition.” Investment Company Institute, 401 U.S. at 640, 91 S.Ct. 1091 (Harlan, J., dissenting). But that fact, the Court held, was not fatal to the plaintiffs’ case; it was enough to satisfy the zone of interests test that Congress, for its own reasons, “did legislate against the competition that the petitioners challenge.” Id. at 621, 91 S.Ct. 1091 (majority opinion).
Thus, at the time of its inception, the zone of interests test was understood to be part of a broader trend toward expanding the class of persons able to bring suits under the APA challenging agency actions. See Copper & Brass Fabricators Council, Inc. v. Department of the Treasury, 679 F.2d 951, 953 n. 2 (D.C.Cir.1982) (R.B. Ginsburg, J., concurring) (in each of the Supreme Court’s first four zone of interests decisions, the Court “utilized the ‘zone’ test to reverse lower court decisions which had held that the respective plaintiffs lacked standing”). Although the Supreme Court was cognizant of the dangers of freely permitting judicial review of agency decisions, it nonetheless “struck the balance in a manner favoring review,” as the Court later described it, excluding only “those would-be plaintiffs not even arguably within the zone of interests to be protected or regulated by the statute.” Clarke v. Securities Industry Association, 479 U.S. 388, 397, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (internal quotation marks omitted).
And importantly for present purposes, the Supreme Court in those early zone of interest cases specifically held that the class of persons who could sue specifically included plaintiffs who were complaining about what they alleged was unlawfully lax agency regulation of the plaintiffs’ competitors. The theory was simple: Competitors, almost by definition, are among the class of people “arguably” to be “protected” when Congress limited the activities of other competitors in the relevant industry. So absent a discernible congressional intent to preclude suit by the plaintiffs, the suit could proceed.
In the years following Data Processing, however, this Court appeared to resist the Supreme Court’s direction on competitor suits under the zone of interests test. This Court’s cases still said, for example, that the zone of interests test required “some indicia — however slight — that the litigant before the court was intended to be protected” by the statute providing a cause of action. See, e.g., Copper & Brass Fabricators, 679 F.2d at 952 (majority opinion).
In Clarke v. Securities Industry Association, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), however, the Supreme Court reaffirmed that it meant what it said in Data Processing. And the Court in Clarke explicitly stated that D.C. Circuit cases had incorrectly departed from Data Processing. See id. at 400 n. 15, 107 S.Ct. 750.
Clarke was another case in which some plaintiffs argued that the Comptroller of *1269 the Currency’s regulation of the plaintiffs’ competitors was unduly lax. Specifically, securities brokers challenged the Comptroller’s decision to exempt certain bank offices that offered brokerage services from restrictions on branch banking. The Court began its analysis by clarifying that although the zone of interests test was “basically one of interpreting congressional intent,” the inquiry did not require a congressional intent to benefit the plaintiff class. Clarke, 479 U.S. at 394, 399-400, 107 S.Ct. 750. Rather, suits would be allowed unless a “congressional intent to preclude review” in suits by the plaintiffs was “fairly discernible.” Id. at 403, 107 S.Ct. 750 (citing Block v. Community Nutrition Institute, 467 U.S. 340, 351, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984)) (internal quotation marks omitted). The zone of interests test “is a guide for deciding whether, in view of Congress’ evident intent to make agency action presumptively renewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiffs interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding.” Id. at 399, 107 S.Ct. 750.
In sum, Clarke confirmed the capacious view of the zone of interests requirement announced in Data Processing and similar cases. It reaffirmed the presumption in favor of allowing suit and made clear that the suit should be allowed unless the statute evinces discernible congressional intent to preclude review. See 3 RichaRD J. Pierce, Jr., Administrative Law Treatise § 16.9, at 1521 (5th ed.2010) (“An injured plaintiff has standing under the APA unless Congress intended to preclude judicial review at the behest of parties in plaintiffs class.”).
And most importantly for our purposes, Clarke confirmed that competitors were presumptively within the zone of interests under the APA when challenging allegedly lax regulation of other competitors in the relevant industry, absent discernible evidence of contrary congressional intent. See id. at 403, 107 S.Ct. 750 (“competitors who allege an injury that implicates the policies of the National Bank Act are very reasonable candidates to seek review of the Comptroller’s rulings”).
As one respected commentator has summarized the Supreme Court’s case law: “It is hardly a caricature to say that the current law is this: Businesses desiring to complain that the government is regulating their competitors with insufficient stringency are invariably and automatically held to fall within the zone of interests of any allegedly violated statute.... ” Jonathan R. Siegel, Zone of Interests, 92 Geo. L.J. 317, 347 (2004) (emphasis added).
Despite the apparent clarity of Clarke— and its explicit disapproval of this Court’s zone of interests cases — some of this Court’s post-Clarke decisions nonetheless still have barred competitors from suing because they are purportedly outside the zone of interests. For example, in Hazardous Waste Treatment Council v. EPA, 861 F.2d 277 (D.C.Cir.1988) — a case on which the Court today relies — we considered a claim by waste treatment companies that EPA’s waste disposal standards were unduly lax toward some competitors of the waste treatment companies. Id. at 283. As I read the cases, Clarke, Data Processing, Investment Company, and Arnold Tours had contemplated that the zone of interests test would be satisfied in such a scenario. Nevertheless, in Hazardous Waste, we held that the plaintiffs did not *1270 fall within the zone of interests “in the absence of either some explicit evidence of an intent to benefit such firms, or some reason to believe that such firms would be unusually suitable champions of Congress’s ultimate goals.” Hazardous Waste, 861 F.2d at 283.
In my view, that language in Hazardous Waste is difficult to square with what the Supreme Court said in Clarke and earlier cases.[9] In those cases, the Supreme Court had specifically said that there does not need to be evidence of an intent to benefit the plaintiff class. In fact, the Supreme Court said that suit should be allowed unless there was a discernible congressional intent to preclude suit by the plaintiff class. In other words, this Court’s cases seemingly flipped the presumption in favor of allowing suit by competitor plaintiffs to a presumption against allowing suit by competitor plaintiffs.
The confusion in our case law has only grown in the years following Hazardous Waste. Sometimes we allow competitors to sue, opining, for example, that we “take from” cases like Clarke “the principle that a plaintiff who has a competitive interest in confining a regulated industry within certain congressionally imposed limitations may sue to prevent the alleged loosening of those restrictions.” First National Bank & Trust Co. v. National Credit Union Administration, 988 F.2d 1272, 1277 (D.C.Cir.1993); see, e.g., Sherley v. Sebelius, 610 F.3d 69, 75 (D.C.Cir.2010) (allowing doctors to sue because of allegedly illegal agency under-regulation of other doctors: “Because the Act can plausibly be interpreted to limit research involving” embryonic stem cells, “the Doctors’ interest in preventing the NIH from funding such research is not inconsistent with the purposes of the Amendment.... [T]hat is all that matters.”); Honeywell International Inc. v. EPA, 374 F.3d 1363, 1370 (D.C.Cir.2004) (allowing chemical manufacturer to sue because of allegedly illegal agency under-regulation of competing chemicals: “If there is reason to believe that a party’s interest in statutory enforcement will advance, rather than hinder, the operation of a statute, the court can reasonably assume that Congress intended to permit the suit.”); Ethyl Corp. v. EPA, 306 F.3d 1144, 1148 (D.C.Cir.2002) (allowing manufacturer of fuel additives to sue because of allegedly illegal under-regulation of automobile manufacturers: zone of interests “includes not only those challengers expressly mentioned by Congress, but also unmentioned potential challengers that Congress would have thought useful for the statute’s purpose”); Wabash Valley Power Association, Inc. v. FERC, 268 F.3d 1105, 1112 (D.C.Cir.2001) (allowing power association to sue because of allegedly illegal under-regulation of merging utility companies: “In this case, as a competitor crying foul, Wabash satisfies prudential standing requirements.”); Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1076 (D.C.Cir.1998) (allowing drug manufacturer to sue because of allegedly illegal agency under-regulation of other drug manufacturer: “Upjohn’s interest in limiting competition for its product is, by its very nature, linked with the statute’s goal of limiting competition between generic manufacturers.”) (internal citation and quotation marks omitted); see also Amgen, Inc. v. Smith, 357 F.3d 103, 109 (D.C.Cir.2004) (“Parties motivated by purely commercial interests routinely satisfy the zone of interests test under this court’s precedents.”).
But other times, as in Hazardous Waste, we say exactly the opposite, that competi *1271 tors are not within the zone of interests and are barred from suing. See, e.g., Association of Battery Recyclers, Inc. v. EPA, 716 F.3d 667, 674 (D.C.Cir.2013) (lead smelter could not object to lax regulation of other lead smelters: plaintiff objected “not to any regulatory burden imposed on it but instead to the absence of regulatory burdens imposed on its competitors”); Grocery Manufacturers Association v. EPA 693 F.3d 169, 179 (D.C.Cir. 2012) (food producers could not object to lax regulation of ethanol producers who compete with food producers in market to purchase corn);[10] Cement Kiln Recycling Coalition v. EPA 255 F.3d 855, 871 (D.C.Cir.2001) (hazardous waste combu-stors could not object to lax regulation of competing combustors: “the Council’s interest lies only in increasing the regulatory burden on others”); ANR Pipeline Co. v. FERC, 205 F.3d 403, 408 (D.C.Cir.2000) (natural gas pipeline operator could not object to lax regulation of competitor’s pipeline: plaintiffs “only concern is with suppressing competition from Nautilus, and that economic interest is not within the zone of interests protected by NEPA”); Liquid Carbonic Industries Corp. v. FERC, 29 F.3d 697, 705 (D.C.Cir. 1994) (industrial gas corporation could not object to lax regulation of competitor’s facilities: “There being no indication that Congress intended to benefit a second-tier competitor, Liquid Carbonic does not have standing as an intended beneficiary.”).
Those competing lines of cases have developed without any apparent distinguishing principle. Having carefully reviewed all of them together in one sitting, I frankly cannot find a clear line to separate the cases where we have found competitors to be within the zone of interests from the eases where we have not.
Moreover, there is nothing in the Clean Air Act that poses a stricter limit on competitor suits than in APA cases involving other statutes. The default rule set forth by the Supreme Court for APA cases is that competitors may sue, unless the substantive statute at issue excludes such suits. Nothing in the Clean Air Act indicates an intent to exclude competitor suits. And it is surely not incongruent with the Clean Air Act to allow competitor suits. By definition, a successful competitor suit would mean that the source would have to comply with stricter Clean Air Act limits. Put simply: Allowing competitor suits in Clean Air Act cases will mean cleaner air. Excluding competitor suits in Clean Air Act cases will mean dirtier air.
Apart from our case law’s internal inconsistency, the larger problem, as I see it, is that the line of cases in this Court that have held that competitors are outside the zone of interests is out of step with the Supreme Court’s case law from Data Processing to Clarke. What is more, the Supreme Court’s cases since Clarke have only reinforced the broad conception set forth in Data Processing and Clarke. See, e.g., National Credit Union Administration v. First National Bank & Trust Co., 522 U.S. 479, 493-94, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998) (“As competitors of federal credit unions, respondents certainly have an interest in limiting the markets that federal credit unions can serve, and the NCUA’s interpretation has affected that interest by allowing federal credit unions to increase their customer base.”); see also Air Courier Conference of America v. *1272 American Postal Workers Union, AFL-CIO, 498 U.S. 517, 529, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991) (“Clarke is the most recent in a series of cases in which we have held that competitors of regulated entities have standing to challenge regulations.”); Lexmark International, Inc. v. Static Control Components, Inc., — U.S. —, 134 S.Ct. 1377, 1388-89, 188 L.Ed.2d 392 (2014) (a “lenient approach” to the zone of interests test “is an appropriate means of preserving the flexibility of the APA’s omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review”).
Among the Supreme Court’s post-Clarke decisions is Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, -U.S.-, 132 S.Ct. 2199, 183 L.Ed.2d 211 (2012). Athough not a competitor case, the reasoning of Matchr-E reinforces Data Processing and Clarke, and reaffirms the Supreme Court’s broad conception of the zone of interests under the APA.
Writing for the Court in Matchr-E, Justice Kagan reiterated that the zone of interests requirement is a low bar: The test “is not meant to be especially demanding. We apply the test in keeping with Congress’s evident intent when enacting the APA to make agency action presumptively renewable. We do not require any indication of congressional purpose to benefit the would-be plaintiff. And we have always conspicuously included the word ‘arguably’ in the test to indicate that the benefit of any doubt goes to the plaintiff. The test forecloses suit only when a plaintiffs interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.” Id. at 2210 (emphasis added) (footnote, citation, and some internal quotation marks omitted).
Matchr-E reaffirmed — in line with Data Processing and Clarke — that the plaintiff need not be among a class that Congress intended to benefit in the statute at hand. And Match-E further reaffirmed that a wide variety of interest's, including economic interests related to the agency’s allegedly unlawful action with respect to someone else, fall within the zone of interests. There, a residential property owner claimed that the Interior Department violated federal law when it acquired a parcel of land for use by a nearby Indian tribe as a casino. See id. at 2202-03. All agreed that the federal statute was not designed to benefit a property owner who objects when the Federal Government acquires another property owner’s land in order to help Indians. See id. at 2210 n. 7. The Supreme Court nonetheless concluded that the zone of interests test was satisfied. The Supreme Court said that “neighbors to the use (like Patchak) are reasonable— indeed, predictable — challengers of the Secretary’s decisions: Their interests, whether economic, environmental, or aesthetic, come within § 465’s regulatory ambit.” Id. at 2212 (emphasis added).
Given its music and its words, Match-E should have put a final end to this Court’s crabbed approach to the zone of interests test. But our Court has still continued since Matchr-E to hold — at least in some cases — that the zone of interests test prevents businesses from complaining about allegedly illegal agency under-regulation of their competitor businesses. See, e.g., Association of Battery Recyclers, 716 F.3d at 674; Grocery Manufacturers Association, 693 F.3d at 179.
Put simply, our current zone of interests case law is inconsistent and unpredictable. Perhaps most troubling, our cases holding that competitors are outside the zone of interests are inconsistent with Supreme *1273 Court precedent, as I read it. In my respectful view, too much is at stake in the administrative process, for health, safety, and environmental regulation, and for the economic interests affected by these cases for us to continue muddling along in this way. This state of affairs should receive a careful examination at some point in the near future. Whether a party can sue in court to challenge illegal agency action on such important matters should not come down to the equivalent of a coin flip. We can do better.
* * *
I respectfully dissent from the majority opinion’s conclusion that EPA may reasonably exclude consideration of costs when deciding whether it is appropriate to regulate electric utilities under the MACT program. And on the zone of interests test, I accept the majority opinion’s conclusion that Julander falls outside the zone of interests, at least under some of our precedents. But in my view, those precedents are not consistent with other decisions of this Court or with the Supreme Court’s case law and should be corrected in due course.

. Six other common pollutants emitted by stationary sources are regulated under a different section of the Clean Air Act. The National Ambient Air Quality Standards, or NAAQS, prescribe the maximum permissible levels of those six pollutants in the ambient air. See 42 U.S.C. § 7409(a)-(b). Under that NAAQS program, EPA must choose levels for emissions of those pollutants which, "allowing an adequate margin of safety, are requisite to protect the public health.” Id. § 7409(b)(1).

. The electric utilities included in this alternative system are coal- and oil-fired electric utility steam generating units.

. In full, the relevant section of the statute reads: "The Administrator shall perform a study of the hazards to public health reasonably anticipated to occur as a result of emissions by electric utility steam generating units of pollutants listed under subsection (b) of this section after imposition of the requirements of this chapter. The Administrator shall report the results of this study to the Congress within 3 years after November 15, 1990. The Administrator shall develop and describe in the Administrator’s report to Congress alternative control strategies for emissions which may warrant regulation under this section. The Administrator shall regulate electric utility steam generating units under this section, if the Administrator finds such regulation is appropriate and necessary after considering the results of the study required by this subparagraph.” 42 U.S.C. § 7412(n)(l)(A).

.The other key statutory term in Section 112(n)(l)(A) — "necessary”—is not in dispute. EPA states that regulation of electric utilities is necessary "if the identified or potential hazards to public health or the environment will not be adequately addressed by the imposition of the requirements of” the Clean Air Act. 76 Fed.Reg. 24,976, 24,987 (May 3, 2011).

. To be clear, I do not read the statutory text at issue in the EME Homer case as encompassing costs, at least not in the way EPA argued there. But regardless of how that particular case turns out, the background principle succinctly articulated by Justice Ka-gan at oral argument reflects the commonsense and well-settled understanding that cost is an essential factor in determining whether it is "appropriate” to regulate.

. On the Chevron point, I add one further comment. When the Government wins a Chevron case, it may prevail at Chevron step one (because the agency's interpretation of the statute is mandated by the statutory language) or at Chevron step two (because the agency’s interpretation of an ambiguous statute is at least reasonable). In those cases, the step one or step two label may have practical significance, as it may determine whether the agency could try to adopt a contrary interpretation in the future. On the other hand, when the agency loses a Chevron case because the agency has adopted an interpretation outside the permissible bounds of the statute, even after reading relevant ambiguities in the agency's favor, there is not much if any practical difference for purposes of future agency action whether we label our decision as Chevron step one or Chevron step two. See generally City of Arlington v. FCC, - U.S. -, 133 S.Ct. 1863, 1868, 1874, - L.Ed.2d - (2013). So it is here, in my view.

. This Court has traditionally referred to the zone of interests test as a component of "prudential standing.” As the Supreme Court has recently explained, however, the test does not belong under the "prudential” rubric. Lexmark International, Inc. v. Static Control Components, Inc., -U.S. -, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). Instead, whether a plaintiff comes with the "zone of interests” is a statutory question "that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim.” Id. at 1387.

. Although Data Processing referenced the Administrative Procedure Act, the opinion did not explicitly tie the zone of interests test to the text of the APA. The Court subsequently clarified that the zone of interests test is a "gloss” on Section 702 of the APA, which grants the right to judicial review of an agency action to any person "adversely affected or aggrieved” by that action. See Clarke v. Securities Industry Association, 479 U.S. 388, 395, 400 n. 16, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).

. Chief Judge Wald stated as much at the time. See Hazardous Waste Treatment Council v. Thomas, 885 F.2d 918, 931 (D.C.Cir. 1989) (Wald, C.J., dissenting).

. In Grocery Manufacturers Association v. EPA, 693 F.3d 169 (D.C.Cir.2012), we addressed an additional question of whether the zone of interests test is a jurisdictional requirement. The Supreme Court has since made clear that the zone of interests test is not jurisdictional. See Lexmark International, Inc. v. Static Control Components, Inc., - U.S.-, 134 S.Ct. 1377, 1387, 188 L.Ed.2d 392 (2014).